FRANCIS M. GREGOREK (144785)
BETSY C. MANIFOLD (182450)
FRANCIS A. BOTTINI, JR. (175783)
RACHELE R. RICKERT (190634)
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
Symphony Tower
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

C 06 4165

RUTHY PARNES, IN THE RIGHT OF AND FOR THE BENEFIT OF VERISIGN INC.,

Plaintiff,

v.

D. JAMES BIDZOS, WILLIAM L. CHENEVICH, DAVID J. COWAN, DANA L. EVAN, QUENTIN P. GALLIVAN, MICHELLE GUTHRIE, DIANA S. KEITH, ROBERT J. KORZENIEWSKI, SCOTT G. KRIENS, LEN J. LAUER, ROGER H. MOORE, EDWARD A. MUELLER, ANIL H.P. PEREIRA, GREGORY L. REYES, WILLIAM A. ROPER, JR., ARNOLD SCHAEFFER, STRATTON D. SCLAVOS, LOUIS A. SIMPSON, RICHARD A. YANOWITCH,

Defendants,

and

VERISIGN INC.,

Nominal Defendant.

CASE NO.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

JURY TRIAL DEMANDED

Plaintiff, Ruthy Parnes ("Parnes" or "plaintiff"), by and through her attorneys, derivatively on behalf of VeriSign Inc. ("VeriSign" or the "Company"), alleges upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding the Company as follows:

## SUMMARY

1. Plaintiff, derivatively on behalf of Nominal Defendant VeriSign, seeks relief for the damages sustained, and to be sustained by VeriSign, against certain former and current senior executives ("Management Defendants") and the Company's Board of Directors (the "Director Defendants") for violations of state and federal law, including their breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), which occurred between January 1, 1998 and the present (the "Relevant Period").

2. The Management Defendants have engaged in certain transactions, including the exercise of back-dated options, to reap millions of dollars in unlawful windfall profits at the expense of the Company.

3. A stock option granted to an employee of the Company allows the employee to purchase Company stock at a specified price — referred to as the "exercise price" — for a specified period of time. Stock options are granted as part of an employee's compensation package to create incentives for him or her to boost profitability and stock value. When an employee exercises an option, he or she purchases the stock from the Company at the exercise price, regardless of the stock's price at the time the option is exercised.

4. The unlawful conduct occurred while Director Defendants were directing the Company. These defendants authorized or failed to halt the back-dating of options in dereliction of their fiduciary duties to the Company as directors, thus causing or allowing the Company to suffer millions of dollars in harm.

5. Under the Company's relevant stock option plans, options are required to be priced

at the price of the Company stock on the day of the grant. If an option is back-dated to a day on which a market price was lower than the price on the day the option is granted, then the employee pays less and the Company gets less money for the stock when the option is exercised. Furthermore, the purchaser of the option gets a greater compensation than that to which he or she is entitled. Such conduct is unlawful.

6. On May 19, 2006, *The Wall Street Journal* published an analysis of stock options granted to chief executive officers of half a dozen companies in an article titled, "U.S. INTENSIFIES STOCK-OPTIONS PROBE: Subpoenas by Prosecutors in Manhattan Office Signal Major Step-up in Scrutiny." The subject matter of this article, and several others in previous and subsequent days, was the illegal backdating of stock option grants to senior executives at the expense of public companies like VeriSign and its shareholders.

7. On June 27, 2006, the Company announced that it had received a grand jury subpoena from the U.S. Attorney for the Northern District of California requesting documents relating to VeriSign's stock option grants and practices. The Company also announced that it had received an informal inquiry from the Securities and Exchange Commission requesting documents related to VeriSign's stock option grants and practices. The Company further revealed that it had commenced an internal review and analysis of its historical stock option grants.

8. Back-dating the options violated the Company's stock option plans. Back-dating the options also breached defendants' fiduciary duties of care, loyalty, and good faith to the Company.

9. Defendants' conduct has unjustly enriched VeriSign's top executives, including the Management Defendants, and has exposed the Company to great expense and liability, to the detriment of the Company and its shareholders.

## I. JURISDICTION AND VENUE

10. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331, because plaintiff's claims arise in part under the Constitution and the laws of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). Additionally, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that

plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(a)(1) because one or more of defendants either resides or maintains executives offices in this Judicial District, and a substantial portion of the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District. Moreover, defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## II. PARTIES

### The Plaintiff

12. Plaintiff Ruthy Parnes is a New York resident and has been a holder of the Company's common stock since June 2000.

13. As a current holder of VeriSign common stock and a holder during the period of the wrongs alleged herein, and pursuant to Fed. R. Civ. P. 23.1, plaintiff has standing to assert these claims on behalf of the Company and will fairly and adequately protect the interests of the Company and its other stockholders.

### The Management Defendants

14. Defendant Stratton D. Sclavos ("Sclavos") has served as President and Chief Executive Officer ("CEO") and as a director of VeriSign since he joined VeriSign in July 1995. In December 2001, he was named Chairman of the Board of Directors. Defendant Sclavos was a member of the Compensation Committee for the period 1999 through 2002. Upon information and belief, defendant Sclavos resides in California.

15. Defendant Quentin P. Gallivan ("Gallivan") was formerly VeriSign's executive vice president of worldwide sales. Upon information and belief, defendant Gallivan resides in California.

16. Defendant Richard A. Yanowitch ("Yanowitch") formerly served as an executive

1  vice president of the Company. Upon information and belief, defendant Yanowitch resides in
2  California.
3      17.   Defendant Dana L. Evan ("Evan") joined the company in May of 1996 and is
4  currently the Executive Vice President of Finance and Administration, and Chief Financial Officer
5  ("CFO"). Upon information and belief, defendant Evan resides in California.
6      18.   Defendant Arnold Schaeffer ("Schaeffer") joined the Company in January of 1996
7  and serves as Executive Vice President of Engineering. Upon information and belief, defendant
8  Schaeffer resides in California.
9      19.   Defendant Diana S. Keith ("Keith") is the Senior Vice President of Customer
10 Advocacy. Upon information and belief, defendant Keith resides in California.
11     20.   Defendant Robert J. Korzeniewski ("Korzeniewski") joined VeriSign in 2000 and
12 is the Executive Vice President of Corporate Development and Strategy. Upon information and
13 belief, defendant Korzeniewski resides in Virginia.
14     21.   Defendant Anil H.P. Pereira ("Pereira") is the former Executive Vice President and
15 General Manager of the Enterprise/Services Provider Division. Upon information and belief,
16 defendant Pereira resides in Washington.
17     22.   Defendants Sclavos, Gallivan, Yanowitch, Evan, Schaeffer, Keith, Korzeniewski
18 and Pereira are sometimes hereinafter referred to as the "Management Defendants."
19 **The Director Defendants**
20     23.   Defendant D. James Bidzos ("Bidzos") has served as Vice Chairman of the Board
21 of VeriSign since December 2001. He served as Chairman of the Board of VeriSign from April
22 1995 until December 2001 and served as CEO of VeriSign from April 1995 to July 1995.
23 Defendant Bidzos served on the Compensation Committee in 1999 through 2002. Upon
24 information and belief, defendant Bidzos resides in California.
25     24.   Defendant William Chenevich ("Chenevich") has been a member of the Board of
26 Directors since the Company's founding in 1995. He has been a member of the Compensation
27 Committee for the period 1999 through 2002. Upon information and belief, defendant Chenevich
28 resides in Wisconsin.

25.  Defendant David J. Cowan ("Cowan") was a member of the Board of Directors and served on the Compensation Committee during the period 1999 through 2002. Upon information and belief, defendant Cowan resides in California.

26.  Defendant Michelle Guthrie ("Guthrie") has been a member of the Board of Directors since December 2005. Upon information and belief, defendant Guthrie resides in Asia.

27.  Defendant Scott G. Kriens ("Kriens") has been a member of the Board of Directors since January 2001. He was a member of the Compensation Committee in 2001 and 2002. Defendant Kriens is the Chairman and CEO of Juniper Networks, a company that is also under investigation for backdating of its options to top executives. Upon information and belief, defendant Kriens resides in California.

28.  Defendant Len J. Lauer ("Lauer") has been a member of the Board of Directors since February 2004. Defendant Lauer is a member of the Compensation Committee and resides in Kansas.

29.  Defendant Roger H. Moore ("Moore") has been a member of the Board of Directors since February 2002. Defendant Moore served on the Compensation Committee in 2002. Upon information and belief, defendant Moore resides in California.

30.  Defendant Edward A. Mueller ("Mueller") has been a member of the Board of Directors since March 2005. Upon information and belief, defendant Mueller resides in Texas.

31.  Defendant Gregory L. Reyes ("Reyes") has been a member of the Board of Directors since April 2001. Defendant Reyes has served on the Compensation Committee since 2002. Upon information and belief, defendant Reyes resides in California.

32.  Defendant William A. Roper, Jr. ("Roper") has been a member of the Board of Directors since November 2003. Upon information and belief, defendant Roper resides in California.

33.  Defendant Louis A. Simpson ("Simpson") has been a member of the Board of Directors since May 2005. He is also the Chair of the Compensation Committee. Upon information and belief, defendant Simpson resides in Illinois.

34.  Defendants Bidzos, Chenevich, Cowan, Guthrie, Kriens, Lauer, Moore, Mueller,

Reyes, Roper and Simpson, are sometimes collectively referred to as the "Director Defendants."

**The Nominal Defendant**

35. Nominal Defendant VeriSign is a Delaware corporation with its executive offices and principal place of business located at 487 East Middlefield Road, Mountain View, California 94043. VeriSign operates intelligent infrastructure services that enable and protect billions of interactions every day across the world's voice and data networks. According to its website, everyday the Company processes as many as 18 billion Internet interactions and supports over 100 million phone calls. VeriSign has offices throughout the Asia-Pacific region, Europe, Latin America, and North America, supported by an international network of data centers and operations centers.

### III. OBLIGATIONS AND DUTIES OF THE DEFENDANTS

36. By reason of their positions as directors, officers, and/or fiduciaries of the Company and because of their ability to control the business, corporate and financial affairs of the Company, each of the defendants owed the Company and its shareholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets; the duty of loyalty, to put the interests of the Company above their own financial interests; and the duty of candor, including full and candid disclosure of all material facts related thereto. Further, defendants owed a duty to the Company and its shareholders to ensure that the Company operated in compliance with all applicable federal and state laws, rules, and regulations, and that the Company not engage in any unsafe, unsound, or illegal business practices. The conduct of defendants complained of herein involves knowing violations of their duties as directors of the Company, and the absence of good faith on their part, which defendants were aware or should have been aware, posed a risk of serious injury to the Company.

37. To discharge these duties, defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Company. By virtue of this obligation of ordinary care and diligence, defendants were required, among other things, to:

(a) manage, conduct, supervise, and direct the employees, businesses and affairs of the Company in accordance with laws, rules and regulations, and the charter and by-laws of the Company;

(b) neither violate nor knowingly or recklessly permit any officer, director or employee of the Company to violate applicable laws, rules and regulations, and to exercise reasonable control and supervision over such officers and employees; ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by the Company;

(c) remain informed as to how the Company was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of financial controls to gather and report information internally, to allow defendants to perform their oversight function properly to prevent the use of non-public corporate information for personal profit;

(d) supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by the Company, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company, and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

(e) preserve and enhance the Company's reputation as befits a public corporation and to maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

38. Defendants breached their duties of loyalty, full disclosure, due care and/or good faith by back-dating options and/or allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results, as detailed herein, and/or by failing to prevent defendants from taking such illegal actions.

IV. **VERISIGN'S STOCK OPTION PLANS**

39. During the Relevant Period the Company had two stock option plans – the 1998 Equity Incentive Plan and the 1998 Directors Plan (hereinafter collectively the "Option Plans"). The Option Plans covered both Incentive Stock Options, which were granted to employees, and Non-Statutory Stock Options, which were granted to employees, directors and consultants. Both plans are, according to the Company's Proxy, administered by the Compensation Committee,

1  which "determines the persons who are to receive the Awards, the number of shares subject to
2  each such Award, The Compensation Committee has the authority to construe and interpret any
3  of the provisions of the Equity Incentive Plan or any Awards granted thereunder." The Option
4  Plans require that the exercise price of all incentive stock options granted "must be at least equal
5  to the fair market value of the common stock on the date of the grant."

**The Suspicious Stock Option Grants**

40. In 1998, the Company made suspicious stock option grants to defendants Sclavos, Gallivan, Yanowitch, Evan and Shaeffer (the "1998 Defendants"):

   (a) On October 30, 1998, the Company allegedly awarded stock option grants to the 1998 Defendants at an exercise price of $30.69. Just a month later, the stock rose to $40.12.

   (b) In December of 1998, the Company allegedly awarded two separate stock option grants to defendant Sclavos — one on December 15th at a price of $49.25, and another three days later on December 18th at an exercise price of $51.13. Approximately a month later, the stock soared to $88.62.

41. In 2000, VeriSign granted suspicious stock options to defendants Gallivan, Evan, and Keith (the "2000 Defendants"). On August 1, 2000, the Company purportedly awarded stock options to the 2000 Defendants at an exercise price of $151.25. Just a month later, the stock price climbed to $198.88.

42. In 2001, the Company granted suspicious stock options to defendants Gallivan, Korzeniewski and Pereira (the "2001 Defendants").

   (a) On March 15, 2001, VeriSign purportedly awarded stock options to the 2001 Defendants at an exercise price of $34.44. A month later, on April 18, 2001, the stock price rose to $47.00.

   (b) On September 6, 2001, the Company allegedly awarded stock options to the 2001 Defendants at an exercise price of $34.16. Approximately one month later, on October 8, 2001, the stock price increased to $47.80.

**The Consequences**

43. As a result of the back-dating and other manipulation of options issued to the 1998, 2000 and 2001 Defendants, they have been unjustly enriched in the amount of millions of dollars at the expense of the Company. The Company has received and will receive less money from the

1998, 2000 and 2001 Defendants when they exercise their options at prices substantially lower than they would have if the options had not been back-dated.

44. The practice of back-dating stock options not only lined the pockets of the Company's executives at the direct expense of the Company, but also resulted in the overstatement of the Company's profits. This is because options priced below the stock's fair market value when they were awarded brought the recipient an instant paper gain that must be accounted for as additional compensation and treated as an expense to the Company. The Company must account for the options at a lower price, and may have to restate its results to reflect the previously unreported expenses.

45. The practice of back-dating options has caused the Company to suffer additional adverse consequences, including (i) the drop in its stock price attributable to the market's loss of confidence in the Company's management, thus increasing the Company's cost of borrowing and otherwise harming its operations, and (ii) exposure to the cost of defending against and potential liability for regulatory actions and private securities class actions.

## V. THE VERISIGN BOARD

46. During the Relevant Period, the Company, through the actions of the Company's Board of Directors and its Compensation Committee, granted stock options for the purchase of millions of shares of the Company's common stock to the Management Defendants.

47. The Director Defendants misrepresented and actively concealed and caused the Company to misrepresent and actively conceal in public SEC filings that the stock options were priced at less than the fair market value of the stock on the date of the grant, thereby affirmatively concealing the claims set forth herein. The stock option plans, referenced above, were exhibits that were incorporated by reference each year in the Company's Annual Reports on Form 10-K. Also, the Management Defendants' compensation, including their stock option grants, were disclosed in the Company's yearly proxy statements promulgated in connection with the Company's annual meetings. The Director Defendants' misrepresentations about their stock option pricing practices were known to be false or were made in reckless disregard of its truth or falsity, and the concealment could not have been discovered through reasonable diligence by the typical

1  shareholder.

2  48. Contrary to the provisions in the Option Plans and public disclosures, as shown by the pattern of grant dates that were highly favorable to the 1998, 2000 and 2001 Defendants, the stock options were not, in fact, priced on the date of the grant, but were in fact back-dated illegally and/or designed solely to benefit the Management Defendants.

49. Director Defendants stood in a fiduciary relationship with the Company's shareholders and thereby owed them duties of due care and loyalty. These duties require the Board to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interest of the Company and its shareholders.

50. Director Defendants violated their fiduciary duties to the Company by failing to act with due care, loyalty and good faith when they either expressly authorized the practice of back-dating options, or in conscious abrogation of their fiduciary duties, permitted it to occur.

51. Instead of properly disclosing these improper stock option backdating practices and the corresponding understatement of compensation costs, Director Defendants caused or allowed these practices to continue unabated throughout the Relevant Period.

52. Director Defendants' breaches of their fiduciary duties have exposed the Company to a number of harms including: the expense of internal investigation; the expense of SEC investigations; the potential liability under tax laws and federal securities laws; the possibility of having to restate financial results; and liability to stock purchasers.

## VI. DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

53. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the injuries suffered, and to be suffered, by the Company as a direct result of the breach of fiduciary duty, waste of corporate assets, and unjust enrichment, alleged herein. The Company is named as a nominal defendant solely in a derivative capacity.

54. Plaintiff will adequately and fairly represent the interest of the Company in enforcing and prosecuting its rights.

55. Plaintiff is and has continuously been an owner of the Company stock during the

wrongful conduct alleged herein.

56. Plaintiff did not make demand on the Board of Directors of the Company to bring this action on behalf of the Company because such a demand would have been a futile, wasteful and useless act for the following reasons:

(a) Between 1998 and 2000, defendant Sclavos was the recipient of the stock options, which plaintiff alleges were back-dated. Because Sclavos received a personal financial benefit from the challenged transactions, he is interested and demand upon him is futile.

(b) All of the Director Defendants authorized, approved, ratified or have failed to rectify some or all of the back-dated stock option grants at issue here and are named as defendants herein.

(c) The Compensation Committee was at all relevant times responsible for overseeing the Company's stock option plans. The Compensation Committee was required to report back to the entire Board on all aspects of compensation prior to approving any one stock option grant. The members of the Compensation Committee, and the Board by its approval of their recommendations, enabled, or through conscious abdication of duty, permitted the Company to back-date stock options issued to the Management Defendants. By such actions, defendants breached their fiduciary duties to the Company. The back-dating of stock options was in direct violation of the stock option plans.

(d) The back-dating of options as alleged herein was unlawful and not within defendants' business judgment to acquire, authorize, ratify or facilitate.

(e) There was no basis or justification for back-dating the stock options. It was designed solely to benefit the Management Defendants in a manner that was inconsistent with the Company's Option Plans, and the Company's public disclosures, to the detriment of the Company. Hence, the transactions constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by the defendants.

(f) All of the defendants authorized the filing of proxy statements, in support of their nomination as Directors, which failed to disclose that the 1998, 2000 and 2001 Defendants' stock options had been back-dated. They also authorized the disclosures relating to shareholder

approved Option Plans which misrepresented that the options carry the stock price of the day of the award. Any suit by the defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud and proxy violations; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action.

(g) All of the defendants signed the Company's Annual Reports on Form 10-K between 1998 and 2002, which contained the Company's financial statements, which failed to account for the back-dated stock options as compensation and an expense of the Company. As a result, those financial statements of the Company may have overstated its profits and may need to be restated. Any suit by the defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action.

(h) All of the defendants participated in, approved, or through abdication of duty, permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company stockholders and/or acting with negligence and gross negligence disregarded the wrongs complained of herein, and therefore are not disinterested parties.

(i) On information and belief, defendants are protected against liability for breaches of fiduciary duty alleged in the Complaint by directors' and officers' liability insurance policies. However, under those policies, if defendants were to cause the Company to sue itself or certain officers of VeriSign, there would be no directors' and officers' insurance protection. This is yet another reason why defendants are hopelessly conflicted in making any independent determination that would cause the Company to bring this action.

(j) Despite defendants' breaches of duty, the Board of Directors has not recommended that any defendant be relieved of his or her duties as director. By maintaining the *status quo* in light of these breaches of duty, the entire Board failed to exercise proper business judgment and therefore lacks independence.

(k) Most egregiously, the Board of Directors did not require that the 1998, 2000 and 2001 Defendants immediately disgorge all of their ill-gotten gains from their improper manipulation of their stock option grants, did not require them to return all unexecuted stock options to the Company, and did not require them to disgorge their bonuses and equity-based compensation to the Company, despite their indisputable breaches of fiduciary duties, which worked a direct harm to the Company. Nor did they take any other action, including commencing legal proceedings, to protect the interests of the Company.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act

57. Plaintiff incorporates by reference and realleges paragraphs 1 through 56 above, as if set forth herein.

58. Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders which were contained in the Company's Definitive Proxy filed on April 3, 2002, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct alleged herein, each Director Defendant violated Section 14(a) of the Exchange Act. The information would have been material to the Company's shareholders in determining whether to elect directors to manage their company.

59. Plaintiff, on behalf of the Company, hereby seeks to void the election of Director Defendants based upon the misleading and incomplete proxy materials, and to recover damages caused by defendants' failure to disclose the improper compensation described herein.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

60. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

61. The defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

62. The defendants, and each of them, violated and breached their fiduciary duties of

care, loyalty, reasonable inquiry, oversight, good faith and supervision.

63. Each of the defendants authorized, or by abdication of duty, permitted the stock options granted to Management Defendants to be back-dated. These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

64. As a direct and proximate result of the defendants' breaches of their fiduciary duties, defendants have caused, and will continue to cause, the Company to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to the Company's reputation, business and good will.

65. The Company has been directly and substantially injured by reason of the defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company, in an amount to be proven at trial.

## COUNT III

### Against All Defendants for Gross Mismanagement

66. Plaintiff incorporates by reference all paragraphs above as if set forth herein.

67. By their actions alleged herein, the defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

68. As a direct and proximate result of the defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained and will continue to sustain significant damages in the millions of dollars.

69. As a result of the misconduct and breaches of duty alleged herein, the defendants are liable to the Company.

## COUNT IV

### Against Defendants for Waste of Corporate Assets

70. Plaintiff incorporates by reference all paragraphs above as if set forth herein.

71. By engaging in the wrongdoing alleged herein, defendants wasted corporate assets

by, among other things, improperly granting stock option grants, improperly manipulating stock options, failing to recover improperly secured profits, damaging the goodwill and reputation of the Company, and exposing the company to civil and criminal liability, for which they are liable.

72. As a direct and proximate result of defendants' wrongful conduct, the Company has suffered damages in an amount to be proven at trial.

## COUNT V

### Against the Management Defendants for Unjust Enrichment and Breach of the Duty of Loyalty

73. Plaintiff incorporates by reference all paragraphs above as if set forth herein.

74. As a result of the back-dating of the options granted to them, the Management Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of the Company.

75. Accordingly, this Court should order the Management Defendants to disgorge all profits, benefits and other compensation obtained by the Management Defendants, and each of them, from their wrongful conduct and fiduciary breaches described herein, and should order the options held by the Management Defendants, which have not yet been exercised, to be repriced at the market price of the Company's stock on the dates the Court finds that those options were actually, in fact, granted.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, gross mismanagement, waste of corporate assets and unjust enrichment;

B. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including declaring the improper compensation awards complained of herein to be null and void; and attaching, impounding and/or imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of the Company has an effective remedy;

C. Awarding to the Company restitution from the Management Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Management Defendants as a result of the conduct alleged herein;

D. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 5, 2006

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ, LLP
FRANCIS M. GREGOREK
BETSY C. MANIFOLD
FRANCIS A. BOTTINI, JR.
RACHELE R. RICKERT

*Betsy C Manifold*
BETSY C. MANIFOLD

750 B. Street, Suite 2770
San Diego, California 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

JACOB T. FOGEL
32 Court Street, Suite #602
Brooklyn, New York 11201

Attorneys for Plaintiff Ruthy Parnes

VERISIGN. 13496.CPT

I, Ruthy Parnes, declare that I am a shareholder of Verisign Inc. common stock and have continuously so owned this common stock since June 2000.

I have reviewed the foregoing Verified Derivative Action Complaint, and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of perjury under the laws of the United States.

Dated: June 29, 2006

_Ruthy Parnes_
(signature)