**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re VERISIGN, INC., DERIVATIVE
LITIGATION

_____

THIS ORDER APPLIES TO:
ALL ACTIONS
_____/

No. C 06-4165 PJH

**ORDER GRANTING MOTIONS
TO DISMISS; ORDER GRANTING
MOTION TO COMPEL
ARBITRATION**

     The motions of nominal defendant VeriSign, Inc. ("VeriSign") and the twenty-two

individual defendants for an order dismissing the consolidated amended complaint, and the

motion of defendant KPMG LLP ("KMPG") for an order compelling arbitration came on for

hearing before this court on May 23, 2007.  Plaintiffs appeared by their counsel Francis M.

Gregorek, Marisa C. Livesay, Stephen R. Basser, and John L. Haurssler; VeriSign

appeared by its counsel Christopher H. McGrath, Brian Davis, and Thomas Zaccaro; the

individual defendants appeared by their counsel Steven Kaufhold; and KPMG appeared by

its counsel Dale E. Barnes and Stephanie L. Thomases.  Having read the parties' papers

and carefully considered their arguments and the relevant legal authority, and good cause

appearing, the court hereby GRANTS VeriSign's motion and KMPG's motion, and

GRANTS the individual defendants' motion in part and DENIES it in part.

United States District Court

For the Northern District of California

**BACKGROUND**

This is a shareholder derivative action brought on behalf of nominal defendant VeriSign ("the Company") against certain former and current officers and directors of VeriSign and against its independent auditor, asserting violations of state and federal law, based on alleged backdating of stock option grants.

VeriSign, which was founded in April 1995, is a Delaware corporation with its principal place of business in California.  VeriSign provides Internet-related digital infrastructure, including communications services and content services, as well as products and services that protect online and network interactions.  VeriSign is also the authoritative directory provider of all .com, .net, .cc, and .tv domain names.  According to its website, VeriSign processes as many as 18 billion Internet interactions and supports more than 100 million phone calls a day.

Named plaintiffs Ruthy Parnes and Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees Represented by Local 85 of the Amalgamated Transit Union allege that defendants granted millions of dollars' worth of backdated options on ten dates between October 30, 1998, and February 21, 2002, to certain high-level VeriSign executives, in violation of the Company's shareholder-approved stock option plans.

A stock option granted to an employee or director of a company allows the employee or director to purchase company stock at a specified "exercise" or "strike" price, for a specified period of time.  When an employee or director exercises an option, he or she purchases stock from the company at the exercise price, regardless of the market price of the stock on the date the option is exercised.  Such stock options are generally granted in order to create incentives for employees and directors to boost profitability and the company's stock value.

If the persons responsible for the pricing and/or approval of a stock option grant retroactively base the exercise price for the option on a day when the market price was lower than the price on the day the option is actually granted, the employee or director pays

1   less and the company gets less money for the stock when the option is exercised.

2   Backdating option grants is not per se illegal, assuming it is permitted under the tax laws

3   and the company's by-laws and/or shareholder-approved stock option plans.  What may be

4   unlawful is a company's failure to disclose the backdating or to report the proper

5   compensation expense in its financial statements and other public filings.

6       According to plaintiffs, VeriSign had three stock option plans in effect during the time

7   that the allegedly backdated options were granted.  The 1998 Equity Incentive Plan ("the

8   1998 Plan"), as amended, "provides for the granting of incentive stock options ('ISOs') to

9   employees as administered by the Board."  The 1998 Plan specifies that "the Exercise

10  Price of an ISO will be not less than 100% of the Fair Market Value of the share on the date

11  of the grant."  CAC ¶ 66(a).  The 1998 Plan is "administered by the Compensation

12  Committee, which 'determines the persons who are to receive Awards, the number of

13  shares subject to each Award and the terms and conditions of each such Award.'"  CAC

14  ¶ 67.

15      The 1998 Directors Stock Option Plan ("the 1998 Directors Plan"), as amended,

16  "provides for the granting of non-qualified stock options . . . to certain non-employee

17  members of the VeriSign Board of Directors, as administered by the Board."  The 1998

18  Directors Plan specifies that "[t]he exercise price of an Option shall be the Fair Market

19  Value . . . of the shares, at the time that the Option is granted."  CAC ¶ 66(b).

20      The 2001 Stock Incentive Plan ("2001 Plan") "provides for the granting of non-

21  qualified stock options to officers, consultants, independent contractors and advisors of the

22  Company as administered by the Board, or a Committee thereof."  The 2001 Plan provides

23  that "[t]he exercise price of an Option . . . may not be less than the par value of the shares

24  on the date of the grant."  CAC ¶ 66(c).

25      In the period between late 2005 and June 2006, a series of articles appeared in

26  major U.S. publications including The Wall Street Journal and Forbes, regarding the

27  backdating of options granted to senior executives, directors, and employees at public

28  companies.  The articles reported the unusually high returns received on those options, and

3

United States District Court

For the Northern District of California

noted that a suspiciously large number of options were ostensibly granted at times when stock prices were at periodic lows, followed by sharp increases in price.

On June 26, 2006, VeriSign received a grand jury subpoena from the United States Attorney for the Northern District of California requesting documents relating to VeriSign's stock option grants and practices. The following day, VeriSign issued a press release stating that the Company intended to cooperate with the U.S. Attorney's office in connection with the subpoena. VeriSign also reported that it had received an informal inquiry from the Securities and Exchange Commission requesting documents relating to the Company's stock option grants and practices, and that it was voluntarily responding to the request and intended to cooperate fully with the SEC. VeriSign added, however, that prior to receiving either of those requests, its Board of Directors, assisted by independent legal counsel, had commenced an internal review and analysis of the Company's historical stock option grants, which internal review was continuing.

The first complaint in the present consolidated shareholder derivative action was filed on July 5, 2006. Plaintiffs did not make a demand on VeriSign's Board of Directors before filing suit. The Verified Consolidated Amended Shareholder Derivative Complaint ("CAC"), filed November 20, 2006, alleges nineteen causes of action, sixteen of which (first through thirteenth, and seventeenth through nineteenth) assert claims against some or all of the twenty-two individual defendants, and three of which (fourteenth through sixteenth) assert claims against VeriSign's outside auditor, KPMG.

Plaintiffs divide the twenty-two individual defendants into two groups – nine "option defendants," alleged to have received backdated options; and thirteen "director defendants," members of VeriSign's Board of Directors at various times during the period 1998 to the present. Plaintiffs assert that the director defendants, at the behest of the option defendants, improperly backdated the option grants to make it appear as though the grants had been made on dates when the market price of VeriSign stock was lower than the market price on the actual grant dates. Plaintiffs assert that options purportedly granted on three dates in 1998 (October 30, December 15, and December 18), on two

United States District Court

For the Northern District of California

1   dates in 2000 (August 1 and December 29), on four dates in 2001 (March 15, May 2,

2   August 1, and September 6), and on one date in 2002 (February 21) were backdated.

3        Plaintiffs assert that the alleged backdating violated the terms of the Company's

4   shareholder-approved option plans, and also resulted in option grants with lower exercise

5   prices, which improperly increased the value of the options granted, and improperly

6   reduced the amount the defendants had to pay the Company upon exercise of the options.

7   They also claim that VeriSign failed to record the proper compensation expense, and now

8   faces potential tax and accounting consequences.

9        The option defendants are Stratton D. Sclavos, Quentin P. Gallivan, Richard A.

10  Yanowitch, Dana L. Evan, Arnold Schaeffer, Diana S. Keith, Robert J. Korzeniewski, Anil

11  H.P. Pereira, and F. Terry Kremian.

12       Stratton D. Sclavos ("Sclavos") served as President and Chief Executive Officer

13  ("CEO") and as a director of VeriSign from July 1995 until May 2007.[1]  In December 2001,

14  he was named Chairman of the Board.  Sclavos was allegedly also a member of VeriSign's

15  Compensation Committee from 1999 through 2002.[2]  Plaintiffs assert that Sclavos received

16  six backdated option grants – a grant dated October 30, 1998, for 400,000 shares at the

17  exercise price of $7.67; a grant dated December 15, 1998, for 400,000 shares at the

18  exercise price of $12.31; a grant dated December 29, 2000, for 100,000 shares at the

19  exercise price of $74.19; a grant dated May 2, 2001, for 100,000 shares at the exercise

20  price of $59.40; a grant dated August 1, 2001, for 1,225,000 shares at the exercise price of

21

22       [1] At the time plaintiffs filed the present action, Sclavos was still President and CEO of
23  VeriSign.

24       [2] See CAC ¶ 9.  The court notes, however, that VeriSign's public filings state that the
    Company had a three-member Compensation Committee – and Sclavos does not appear to
25  have been one of the three members.  For example, VeriSign's Form 10-K/A for fiscal year
    ending December 31, 1999, filed on April 27, 2000, states that the members of the
26  Compensation Committee as of that date were Cowan, Bidzos, and Chenevich.  The Definitive
    Proxy Statement issued April 20, 2001, with the notice of the 2001 annual meeting of
27  VeriSign's stockholders, states that the members of the Compensation Committee as of that
    date were Bidzos, Chenevich, and Cowan.  The Definitive Proxy Statement issued April 10,
28  2002, with the notice of 2002 annual meeting of VeriSign's stockholders, states that the
    members of the Compensation Committee as of that date were Bidzos, Cowan, and Reyes.

United States District Court

For the Northern District of California

$55.94; and a grant dated February 21, 2002, for 600,000 shares at the exercise price of $22.71. Plaintiffs also allege that between May 19, 1998 and December 16, 2005, Sclavos sold approximately 2,661,473 shares of VeriSign common stock for proceeds of over $206 million.

Quentin P. Gallivan ("Gallivan") served as VeriSign's Executive Vice-President of Worldwide Sales, from 1997 through 2005. Plaintiffs allege that Gallivan received six backdated option grants – a grant dated October 30, 1998, for 180,000 shares at the exercise price of $7.67; a grant dated August 1, 2000, for 125,000 shares at the exercise price of $151.25; a grant dated December 29, 2000, for 50,000 shares at the exercise price of $74.19; a grant dated March 15, 2001, for 35,000 shares at the exercise price of $34.00; a grant dated September 6, 2001, for 90,000 shares at the exercise price of $34.16; and a grant dated February 21, 2002, for 100,000 shares at the exercise price of $22.71. Plaintiffs assert that between May 20, 1998 and November 25, 2005, Gallivan sold approximately 720,705 shares of VeriSign common stock for proceeds of over $53 million.

Richard A. Yanowitch ("Yanowitch") served as VeriSign's Executive Vice President of Internet Services from approximately 1996 to 2001. Plaintiffs assert that Yanovitch received one backdated option grant – a grant dated October 30, 1998, for 180,000 shares at the exercise price of $7.67 – and that between May 19, 1998 and August 29, 2000, Yanowitch sold 608,156 shares of VeriSign common stock for proceeds of over $67 million.

Dana L. Evan ("Evan") joined VeriSign in May 1996 and was the Executive Vice-President of Finance and Administration and the Chief Financial Officer ("CFO") until approximately July 2007.[3] Plaintiffs allege that Evan received six backdated option grants – a grant dated October 30, 1998, for 240,000 shares at the exercise price of $7.67; a grant dated August 1, 2000, for 125,000 shares at the exercise price of $151.25; a grant dated December 29, 2000, for 25,000 shares at the exercise price of $74.19; a grant dated March 15, 2001, for 40,000 shares at the exercise price of $34.00; a grant dated September 6,

---

[3] At the time plaintiffs filed the present action, Evan was still VeriSign's CFO.

United States District Court
For the Northern District of California

2001, for 90,000 shares at the exercise price of $34.16; and a grant dated February 21, 2002, for 100,000 shares at the exercise price of $22.71.  Plaintiffs also assert that between May 19, 1998 and February 14, 2006, Evan sold approximately 654,743 shares of VeriSign common stock for over $62 million in proceeds.

Arnold Schaeffer ("Schaeffer") joined VeriSign in January 1996 and served for some period of years as Executive Vice-President of Engineering.  Plaintiffs allege that Schaeffer received one backdated option grant – a grant dated October 30, 1998, for 360,000 shares at the exercise price of $7.67 – and that between May 19, 1998 and November 19, 1999, Schaeffer sold approximately 172,529 shares of VeriSign common stock for proceeds of over $14.5 million.

Diana S. Keith ("Keith") joined VeriSign as Director of Customer Services in June 1996, and was promoted to Senior Vice-President of Customer Advocacy in August 1998.  She left VeriSign in approximately 2001.  Plaintiffs assert that Keith received one backdated option grant – a grant dated August 1, 2000, for 50,000 shares at the exercise price of $151.25.

Robert J. Korzeniewski ("Korzeniewski") joined VeriSign in 2000 and is the Executive Vice-President of Corporate Development and Strategy.  Plaintiffs allege that Korzeniewski received three backdated option grants – a grant dated March 15, 2001, for 35,000 shares at the exercise price of $34.44; a grant dated September 6, 2001, for 90,000 shares at the exercise price of $34.16; and a grant dated February 21, 2002, for 100,000 shares at the exercise price of $22.71.  Plaintiffs also assert that between August 1, 2000 and February 14, 2006, Korzeniewski sold approximately 239,150 shares of VeriSign common stock for over $14 million in proceeds.

Anil H.P. Pereira ("Pereira") served as Executive Vice-President and General Manager of the Enterprise/Services Provider Division of VeriSign from 1997 to 2003.  Plaintiffs allege that Pereira received two backdated option grants – a grant dated March 15, 2001, for 35,000 shares at the exercise price of $34.44; and a grant dated September 6, 2001, for 50,000 shares at the exercise price of $34.16.  Plaintiffs also assert that

**United States District Court**
For the Northern District of California

1   between January 31, 2001 and November 29, 2001, Pereira sold approximately 84,600

2   shares of VeriSign common stock for over $4.5 million in proceeds.

3     F. Terry Kremian ("Kremian") served as Executive Vice-President and General

4   Manager, Finance and Administration, and CFO of VeriSign from December 2001 through

5   2003.  Plaintiffs allege that Kremian received one backdated option grant – a grant dated

6   February 21, 2002, for 180,000 shares at the exercise price of $22.71.

7     The director defendants are thirteen current or former directors of VeriSign, all of

8   whom signed 10-Ks with allegedly false financial statements, and some of whom are

9   alleged to have been members of the Compensation Committee, the Audit Committee, or

10  the Nominating and Corporate Governance Committee at various times, including at the

11  time of the backdated option grants; to have sold VeriSign stock during the relevant time

12  period; or to have been "implicated" in options backdating at other companies.  However,

13  none of the director defendants is alleged to have received backdated VeriSign options.

14    The director defendants are D. James Bidzos, William Chenevich, Kevin R.

15  Compton, David J. Cowan, Michelle Guthrie, Scott G. Kriens, Len J. Lauer, Roger H.

16  Moore, Edward A. Mueller, Gregory L. Reyes, William A. Roper, Louis A. Simpson, and

17  Timothy Tomlinson.[4]

18    D. James Bidzos ("Bidzos") served as CEO of VeriSign from April 1995 to July 1995,

19  as Chairman of the Board from April 1995 to December 2001, as Vice Chairman of the

20  Board from December 2001 to August 2007, and presently serves as Chairman of the

21  Board.[5]  He served on the Compensation Committee for an undetermined period of time.[6]

22  Plaintiffs allege that between August 5, 1998 and May 22, 2001, Bidzos sold approximately

23

24    [4] The CAC does not clearly indicate whether the individual director defendants were

25  inside directors or outside directors, though it appears that most were outside directors.

26    [5] At the time plaintiffs filed the present action, Bidzos was still Vice Chairman of the
Board.

27    [6] In CAC ¶ 44, plaintiffs allege that Bidzos served on the Compensation Committee

28  from 1999 through 2002.  However, in CAC ¶ 93, plaintiffs indicate that Bidzos served on the
Compensation Committee from 1998 through 2004.

**United States District Court**
For the Northern District of California

1    6,353,466 shares of VeriSign common stock for proceeds of over $570 million.

2         William Chenevich ("Chenevich") has been a member of the Board of VeriSign since

3    the Company's founding in 1995.  He was a member of the Compensation Committee for

4    some undetermined period of time.[7]  Plaintiffs allege that between November 24, 1999 and

5    February 10, 2004, Chenevich sold approximately 9,188 shares of VeriSign common stock

6    for proceeds of over $400,000.

7         Kevin R. Compton ("Compton") served on the VeriSign Board from February 1996

8    until March 2005, and was a member of the Audit Committee from 1998 through 2002.

9         David J. Cowan ("Cowan") was a member of the VeriSign Board and served on the

10   Compensation Committee for some undetermined period of time.[8]  Plaintiffs allege that

11   between October 27, 1998 and August 5, 2003, Cowan sold approximately 682,068 shares

12   of VeriSign common stock for proceeds of over $31 million.

13        Michelle Guthrie ("Guthrie") has served as a member of the VeriSign Board since

14   December 2005, and is currently a member of the Compensation Committee.

15        Scott G. Kriens ("Kriens") has been a member of the VeriSign Board since January

16   2001.  He was a member of the Compensation Committee in 2001 and 2002, and is

17   currently a member of the Nominating and Corporate Governance Committee.

18        Len G. Lauer ("Lauer") was a member of the Board and the Compensation

19   Committee from February 2004 until July 2006.

20        Roger H. Moore ("Moore") has served as a member of the VeriSign Board since

21   February 2002.  He served on the Compensation Committee in 2002.

22        Edward A. Mueller ("Mueller") joined the VeriSign Board in March 2005, was

23   appointed to the Compensation Committee effective August 1, 2006, and was elected

24

25        [7]  In CAC ¶ 46, plaintiffs allege that Chenevich was a member of the Compensation
26   Committee from 1999 through 2002.  However, in CAC ¶ 93, plaintiffs indicate that Chenevich
     was a member of the Compensation Committee from 1998 through 2000.

27        [8]  In CAC ¶ 48, plaintiffs allege that Cowan was a member of the Compensation
28   Committee from 1999 through 2002.  However, in CAC ¶ 93, plaintiffs indicate that Cowan was
     a member of the Compensation Committee from 1998 through 2002.

**United States District Court**
For the Northern District of California

1   Chairman of the Board in May 2007.  He resigned from the Board in August 2007.

2       Gregory L. Reyes ("Reyes") was a member of the VeriSign Board from April 2001

3   until July 2006.  He served on the Compensation Committee for an undetermined period of

4   time.[9]

5       William A. Roper ("Roper") has been member of the VeriSign Board since

6   November 2003.  He is currently President and CEO of VeriSign (having replaced Sclavos),

7   and previously served on the Nominating and Corporate Governance Committee and on

8   the Audit Committee.  Plaintiffs allege that between August 4, 2000 and November 30,

9   2000, Roper sold approximately 32,050 shares of VeriSign common stock for proceeds of

10  over $3.87 million.

11      Louis A. Simpson ("Simpson") has been a member of the VeriSign Board since May

12  2005, and currently serves as Chair of the Compensation Committee.

13      Timothy Tomlinson ("Tomlinson") was a member of the VeriSign Board from April

14  1995 through May 2002, and served as Secretary of the Company from April 1995 until

15  October 2000.  Plaintiffs allege that between August 6, 1998 and November 13, 2001,

16  Tomlinson sold approximately 93,306 shares of VeriSign common stock for proceeds of

17  over $10.9 million.

18      The option defendants and the director defendants are referred to collectively as the

19  "individual defendants."  In addition, the seven option defendants and five director

20  defendants who sold shares of VeriSign stock at various times during the period between

21  1998 and 2006 are referred to as the "insider selling defendants."  The insider selling

22  defendants are Sclavos, Gallivan, Yanowitch, Evan, Schaeffer, Korzeniewski, Pereira,

23  Bidzos, Chenevich, Cowan, Roper, and Tomlinson.

24      The 116-page CAC pleads nineteen causes of action – thirteen state law claims

25  asserted against some or all of the individual defendants, three state law claims asserted

26

27          [9]  In CAC ¶ 55, plaintiffs allege that Reyes was a member of the Compensation
28  Committee from 2002 through July 2006.  However, in CAC ¶ 93, plaintiffs assert that Reyes
    served on the Compensation Committee beginning in 2001.

**United States District Court**

For the Northern District of California

1    against KMPG, and three federal securities claims asserted against some but not all of the

2    individual defendants.  Plaintiffs allege

3          (1)    a claim of breach of fiduciary duty and/or aiding and abetting, against all the

4    individual defendants, alleging that they colluded in a scheme to backdate option grants

5    and cover up their misconduct;

6          (2)    a claim of improper accounting, against all the individual defendants, in

7    connection with alleged backdating of option grants;

8          (3)    a claim of unjust enrichment, against the option defendants, in connection

9    with receipt of backdated option grants and proceeds received through exercising options;

10         (4)    a claim for rescission, against the option defendants, alleging that backdated

11   option grants were invalid under terms of VeriSign's shareholder-approved stock option

12   plans;

13         (5)    a claim of constructive fraud, against all individual defendants, alleging aiding

14   and abetting in the making of misrepresentations to VeriSign's shareholders;

15         (6)    a claim of corporate waste, against all individual defendants, based on

16   allegation that they were unjustly enriched at the expense of the Company;

17         (7)    a claim of breach of contract, against the option defendants, based on their

18   alleged breach of employment agreements with VeriSign and violation of the Company's

19   shareholder-approved stock option plans;

20         (8)    a claim under California Corporations Code § 25402, against the insider

21   selling defendants, for selling VeriSign common stock while in possession of material,

22   adverse, undisclosed information about the Company;

23         (9)    a claim under California Corporations Code § 25403, against the director

24   defendants, alleging that they controlled the insider selling defendants' sale of VeriSign

25   stock;

26         (10)   a claim of gross mismanagement, against all individual defendants, based on

27   the allegation that they abdicated their responsibilities and fiduciary duties with regard to

28   prudently managing the assets and business of the Company;

(11)    a claim for restitution, against the option defendants, based on the assertion that VeriSign has a right to recover any of the proceeds received by these defendants as a result of their exercise of the allegedly backdated options;

(12)    a claim for restitution, against defendants Sclavos, Kremian, and Evan;

(13)    a claim of breach of fiduciary duty, against the director defendants, for failing to bring suit against KPMG;

(14)    a claim of negligence/professional malpractice, against KPMG, based on the allegation that KPMG failed to perform audits in accordance with GAAS;

(15)    a claim of breach of contract, against KPMG, based on the allegation that KPMG breached its contract with VeriSign;

(16)    a claim of aiding and abetting breach of fiduciary duty, against KPMG, based on the assertion that KPMG aided and abetted VeriSign's officers and directors in breaching their fiduciary duties, in that KPMG knew about and participated in the alleged director and officer misconduct;

(17)    a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, against the director defendants and defendant Evan, based on the allegation that these defendants disseminated and approved financial statements, in the Company's Form 10-K filings for fiscal years 1998 through 2005, which did not disclose the Company's alleged option backdating practices;

(18)    a claim under § 14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder, against defendants Sclavos, Gallivan, Yanowitch, Evan, Schaeffer, Korzeniewski, Pereira, and Kremian (all the option defendants except Keith), based on allegations that the Company's proxy statements, issued in connection with the Company's annual meetings in 1999, 2001, 2002, and 2003, falsely reported the option defendants' compensation (because of misrepresentations regarding the option grants);

(19)    a claim under § 20(a) of the Securities Exchange Act, against Evan, Kremian, and the director defendants, based on the allegation that they were controlling persons of VeriSign, and caused VeriSign to engage in unlawful conduct.

United States District Court

For the Northern District of California

1   Nominal defendant VeriSign now seeks an order dismissing the CAC pursuant to

2   Rule 12(b)(6), arguing that plaintiffs have not sufficiently pled particularized facts

3   demonstrating that a pre-filing demand on VeriSign's Board would have been futile.

4   The individual defendants seek an order dismissing the claims asserted against

5   them pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), arguing that all claims

6   are time-barred; that plaintiffs fail to plead the elements of an Exchange Act § 10b(5) or

7   Rule 10b-5 claim; that plaintiffs cannot state a claim under § 14(a) of the Exchange Act or

8   Rule 14a-9; that the § 20(a) claim must be dismissed because the § 10(b)(5) claim is

9   defective; and that certain state law claims are derivative of other claims or fail to state a

10   claim.

11   KPMG seeks an order compelling arbitration of the claims asserted against it, and

12   an order dismissing it from this action or staying the claims asserted against it pending

13   completion of the arbitration.

**DISCUSSION**

15   A.   Motions to Dismiss

16   1.   Legal Standard

17   A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims

18   alleged in the complaint.  Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003).

19   Although its review is generally limited to the contents of the complaint, the Court may

20   consider documents referenced extensively in the complaint and documents that form the

21   basis of a plaintiff's claim.  United States v. Ritchie, 342 F.3d 903, 908-09 (9th Cir. 2003);

22   see also No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. America West

23   Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

24   To survive a motion to dismiss for failure to state a claim, a complaint generally must

25   satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure

26   8(a)(2), which requires that the complaint include a "short and plain statement of the claim

27   showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Specific facts are

28   unnecessary – the statement need only give the defendant "'fair notice of what the claim is

13

United States District Court

For the Northern District of California

1 . . . and the grounds upon which it rests.'" Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007)

2 (quoting Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007)).

3      All allegations of material fact are taken as true. Id. However, a plaintiff's obligation

4 to provide the grounds of his entitlement to relief "requires more than labels and

5 conclusions, and a formulaic recitation of the elements of a cause of action will not do" –

6 rather, the allegations in the complaint "must be enough to raise a right to relief above the

7 speculative level." Bell Atlantic, 127 S.Ct. at 1964-65 (citations and quotations omitted).  A

8 motion to dismiss should be granted if the complaint fails to proffer enough facts to state a

9 claim for relief that is plausible on its face. See id. at 1966-67.

10      Where a complaint includes allegations of fraud, Federal Rule of Civil Procedure

11 9(b) requires more specificity, including an account of the "time, place, and specific content

12 of the false representations as well as the identities of the parties to the

13 misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (citation and

14 quotation omitted).  "To comply with Rule 9(b), allegations of fraud must be specific enough

15 to give defendants notice of the particular misconduct which is alleged to constitute the

16 fraud charged so that they can defend against the charge and not just deny that they have

17 done anything wrong." Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001)

18 (citation and quotations omitted).

19      In dismissing for failure to state a claim, "a district court should grant leave to amend

20 even if no request to amend the pleadings was made, unless it determines that the

21 pleading could not possibly be cured by the allegation of other facts." Doe v. United States,

22 58 F.3d 494, 497 (9th Cir. 1995) (citations omitted); see also Swartz, 476 F.3d at 765;

23 Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).

24      2.    VeriSign's Motion

25      Nominal defendant VeriSign seeks an order dismissing the CAC on the ground that

26 plaintiffs failed to make a demand on the directors prior to filing suit on July 5, 2006, and

27 that the CAC fails to allege demand futility with particularity as required by Federal Rule of

28 Civil Procedure 23.1.  VeriSign also asserts that plaintiffs lack standing because the CAC

United States District Court

For the Northern District of California

1  does not specify the dates they purchased stock in VeriSign, and therefore does not

2  establish that they satisfy the "contemporaneous ownership" requirement.

3      The court agrees with VeriSign and finds that the motion must be GRANTED.

4  Plaintiffs have not alleged particularized facts establishing that a demand on VeriSign's

5  Board would have been futile, and have not adequately alleged that they have standing to

6  bring this action on VeriSign's behalf.

7          a.      Shareholder Derivative Actions

8      A shareholder does not have standing to sue in an individual capacity for injury to

9  the corporation.  William Meade Fletcher, et al., 13 Fletcher Cyclopedia of the Law of

10  Private Corporations, § 5939 (2007).  Such an action must be brought as a derivative

11  action – "an equitable remedy in which a shareholder asserts on behalf of a corporation a

12  claim not belonging to the shareholder, but to the corporation."  Id.  Once the action – if

13  filed in federal court – has been characterized as direct or derivative, the applicable

14  procedural rules are determined by federal law.  Sax v. World Wide Press, Inc., 809 F.2d

15  610, 613 (9th Cir. 1987).

16      Under Federal Rule of Civil Procedure 23.1, a shareholder seeking to vindicate the

17  interests of a corporation through a derivative suit must either first make a demand on the

18  corporation's directors, or plead particularized facts showing why such a demand would

19  have been futile.  See Fed. R. Civ. P. 23.1.  All plaintiffs' claims in the present action are

20  derivative, requiring a demand on VeriSign's Board, or a particularized showing of demand

21  futility.

22      State law – not Rule 23.1 – establishes the circumstances under which demand

23  would be futile.  Thus, because VeriSign is a Delaware corporation, Delaware law governs

24  the issue of whether plaintiffs' failure to make a pre-suit demand on VeriSign's Board is

25  excused.  See In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 989-90 (9th Cir. 1999)

26  (citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96 (1991)).

27      Delaware law provides two demand-futility tests, as set forth in Aronson v. Lewis,

28  473 A.2d 805 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244

**United States District Court**
For the Northern District of California

1   (Del. 2000); and <u>Rales v. Blasband</u>, 634 A.2d 927 (Del. 1993).  When the alleged wrong is

2   the result of a business decision by the whole board of directors, a court should employ the

3   <u>Aronson</u> test, which evaluates whether, under the particularized facts alleged, a reasonable

4   doubt is created 1) that the directors are disinterested and independent, or

5   2) that the challenged transaction was otherwise the product of a valid exercise of business

6   judgment.  <u>Aronson</u>, 473 A.2d at 812.

7         When, however, the board members who approved the challenged act have since

8   changed, or when the challenged act does not constitute a business decision by the board,

9   a court should employ the <u>Rales</u> test, which determines whether the particularized factual

10  allegations create a reasonable doubt that, as of the time the complaint was filed, a

11  majority of the board as constituted at that time could have properly exercised its

12  independent and disinterested business judgment in responding to a demand.  <u>Rales</u>, 634

13  A.2d at 934.  In short,

14        [T]he right of a stockholder to prosecute a derivative suit is limited to
          situations where the stockholder has demanded that the directors pursue the
15        corporate claim and they have wrongfully refused to do so or where demand
          is excused because the directors are incapable of making an impartial
16        decision regarding such litigation.

17  <u>Id.</u> at 932.

18        In the present case, plaintiffs' demand-futility allegations must be examined under

19  the <u>Rales</u> test.  While plaintiffs allege that the members of the Board as of July 5, 2006,

20  were not disinterested and independent, and also assert that the granting of backdated

21  options can never be the product of a good faith exercise of business judgment – thus

22  apparently invoking the <u>Aronson</u> test – the facts as pled show that a majority of the Board

23  members that would have considered the demand were not involved in any decision to

24  backdate the option grants.  Thus, the second prong of the <u>Aronson</u> test is inapplicable.[10]

25  _____

26        [10]   An argument could be made that the <u>Aronson</u> test applies to the claim that the
      directors signed 10-Ks containing false financial statements, at least as to the 10-Ks that were
27    signed by a majority of the current board, except that (a) it is not clear from the allegations of
      the CAC that the act of signing VeriSign's 10-Ks can be considered a Board "decision" or
28    "action;" (b) the CAC alleges that backdating options cannot be a valid exercise of business
      judgment, but contains no such allegation regarding signing 10-Ks; and (c) as discussed

**United States District Court**
For the Northern District of California

b. Analysis

As indicated above, the demand futility is analyzed under the <u>Rales</u> test based on the composition of the board at the time the lawsuit is initiated, as that is the board on which demand would be made. <u>See</u> <u>Harris v. Carter</u>, 582 A.2d 222, 228 (Del. Ch. 1990). When the present action was commenced on July 5, 2006, VeriSign's Board consisted of eleven directors: Sclavos, Bidzos, Chenevich, Guthrie, Kriens, Lauer, Moore, Mueller, Reyes, Roper, and Simpson. To prove that demand would have been futile, plaintiffs must show that a majority of those eleven directors are not disinterested or independent.

The court finds that the motion must be GRANTED. As VeriSign notes in its reply brief, the issue raised in this motion is not the propriety or legality of backdating options, but whether plaintiffs, by pleading particularized facts in the CAC, have overcome the presumption of good faith afforded to directors. Plaintiffs have not alleged particularized facts showing that demand would have been futile because there is a reason to doubt either the disinterestedness and independence of a majority of the Board.

i. Whether the directors are disinterested

Directorial "interest" exists whenever divided loyalties are present, or where the director will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its stockholders. <u>Rales</u>, 634 A.2d at 936.

Plaintiffs allege that Sclavos is interested because he received a financial benefit from the transaction in the form of backdated options; that all the directors are interested because they either "authorized, approved, ratified or . . . failed to rectify" the backdated option grants, or participated in the other wrongs alleged; that the directors who served on the Compensation Committee are interested because they enabled the Company to issue backdated option grants; that directors who authorized the filing of proxy statements in support of their nomination as directors, or who signed VeriSign's 10-Ks, are interested,

below, the § 10(b) cause of action fails to state a claim.

because the proxy statements and financial statements in the 10-Ks failed to disclose that the option grants had been backdated, and any suit to remedy the wrongs complained of could expose those directors to suit; and that the members of the Board are interested because they did not take action to recover the option defendants' "ill-gotten gains."[11]

VeriSign notes that only one of the eleven directors – Sclavos – is alleged to have received any backdated option grants, and argues that the remaining Board members cannot be shown to have received any personal benefit from the alleged wrongdoing. In particular, VeriSign argues that six of the eleven directors could not have been involved in the alleged backdating of option grants, because five – Roper, Lauer, Mueller, Simpson, and Guthrie – did not join VeriSign's Board until well after the last backdating of options is alleged to have occurred, and a sixth – Moore – joined the Board only in February 2002, at the conclusion of the alleged backdating.  Thus, VeriSign argues, this group of six directors constitutes a "disinterested" majority, fully capable of determining whether this action is in the best interests of the Company.  VeriSign contends that the motion can be granted on that basis alone.

VeriSign also argues that plaintiffs' boilerplate allegations that the directors "participated in" or "approved of" the purported wrongdoing are insufficient to establish that they are not disinterested; and similarly, that plaintiffs' conclusory allegations regarding service on the Compensation Committee and the Audit Committee, or regarding failure to assert claims against certain defendants, are insufficient to show an inability to evaluate a shareholder demand.  VeriSign argues further that plaintiffs' claims that the directors are not disinterested because they could be sued for securities fraud or similar claims are not sufficient, as allegations that directors cannot be expected to sue themselves have

---

[11]  Plaintiffs also allege that demand futility is shown by the fact that while the directors may be covered under VeriSign's directors' and officers' liability insurance policies against liability for breaches of fiduciary duty, such coverage would be denied if the directors were to cause the Company to sue itself or certain officers of VeriSign.  CAC ¶ 185(i).  VeriSign contends that such allegations are insufficient to establish that the directors are "interested." Plaintiffs appear to have conceded this point, as they do not respond to this argument in their opposition to the motion.

United States District Court

For the Northern District of California

1    repeatedly been rejected by the courts as insufficient to establish demand futility.

2    *Receipt of personal financial benefit*

3    Plaintiffs allege that Sclavos is "interested" because he received a personal financial

4    benefit in the form of backdated option grants, CAC ¶ 185(a); and contend that the

5    directors who are "insider sellers" – Sclavos, Bidzos, Chenevich, and Roper – are

6    "interested" because they benefitted financially from selling VeriSign stock while in the

7    possession of insider knowledge concerning the purported backdating scheme.

8    A director's interest may be shown by demonstrating "a potential personal benefit or

9    detriment to the director as a result of the decision." Beam ex rel Martha Stewart

10   Omnimedia, Inc., 845 A.2d 1040, 1049 (Del. 2004). The personal benefit must arise "from

11   the challenged transaction." Rales, 634 A.2d at 933. Directors who receive backdated

12   stock options receive a personal benefit that is not shared by the shareholders. See In re

13   Zoran Corp. Derivative Litig., __ F.Supp. 2d __, 2007 WL 1650948, at *8 (N.D. Cal., June

14   5, 2007); In re CNET Networks, Inc. Shareholder Derivative Litig., 483 F.Supp. 2d 947, 958

15   (N.D. Cal. 2007). If a plaintiff can plead with particularity that a director knowingly received

16   backdated grants, that director will be considered interested. In re Zoran, 2007 WL

17   1650948, at *8. Accordingly, based on the allegation that Sclavos received backdated

18   option grants between 1998 and 2002, the court finds that plaintiffs have arguably

19   established that Sclavos was "interested" and incapable of fairly evaluating a demand

20   made on the Board.

21   Corporate insiders sell company stock as a matter of course, and there is no per se

22   rule that makes a director "interested" based solely on generalized allegations that he or

23   she sold company stock while in possession of material, non-public information. See

24   Guttman v. Huang, 823 A.2d 492, 502 (Del. Ch. 2003).

25        [Such a rule] would create the same hair-trigger demand excusal that
         Aronson and Rales eschewed. The balanced approach that is more in
26        keeping with the spirit of those important cases is to focus the impartiality
         analysis on whether the plaintiffs have pled particularized facts regarding the
27        directors that create a sufficient likelihood of personal liability because they
         have engaged in material trading activity at a time when (one can infer from
28        particularized pled facts that) they knew material, non-public information

19

United States District Court

For the Northern District of California

1    about the company's financial condition.

2    Id. (emphasis added).

3        Here, plaintiffs allege that Sclavos sold VeriSign stock on various dates between

4    1998 and 2005, CAC ¶ 178; that Bidzos sold stock on various dates between 1998 and

5    2001, CAC ¶ 169; that Chenevich sold stock on various dates between 1999 and 2004,

6    CAC ¶ 170; and that Roper sold stock on various dates in 2000, CAC ¶ 176.  Apart from

7    the listing of sales of specific numbers of shares of VeriSign stock on specific dates, the

8    CAC's only allegations regarding insider selling are the conclusory assertions that "by

9    reason of their high executive and/or directorial positions within VeriSign," all the insider

10   defendants "had access to highly material information regarding the Company, including

11   the information set forth [in the CAC] regarding the true adverse facts of VeriSign's option

12   backdating, improper accounting, and false financial statements," CAC ¶ 222; and that all

13   the insider selling defendants sold Company stock "while in the possession of materially

14   adverse non-public information regarding the Company," CAC ¶ 167.

15       With the possible exception of Sclavos, these allegations of insider selling are

16   insufficiently particularized to establish that the directors are incapable of objectively

17   considering a demand.  For example, plaintiffs plead no facts as to Bidzos, Chenevich, or

18   Roper individually, establishing that they had knowledge of options backdating at VeriSign.

19   Nor, as to any of these four directors, do plaintiffs plead particularized facts showing that

20   they had any knowledge of any irregularities in the Company's financial statements.

21   Moreover, as to Roper, the facts pled in the CAC establish that he was not even present at

22   VeriSign as an employee or a director when he sold shares of Company stock in 2000 (or

23   when the alleged backdating occurred).

24                    *Potential liability for civil or criminal securities fraud*

25       Plaintiffs allege that all the directors "authorized, approved, [or] ratified" the

26   backdating of stock option grants, and have been named as defendants in this lawsuit,

27   CAC ¶ 185(b); that the members of the Compensation Committee "and the Board by its

28   approval of" the Committee's recommendations, "enabled" or "permitted" the Company to

20

United States District Court

For the Northern District of California

backdate options granted to the option defendants, thereby breaching their fiduciary duties to the Company; and that the backdating of options was unlawful, CAC ¶ 185(c), (d). Plaintiffs also assert that all the directors authorized the filing of proxy statements in support of their election as directors, which failed to disclose that the option defendants' options had been backdated; and "authorized the disclosures relating to shareholder approved option plans which misrepresented that the options carry the stock price of the day of the award," CAC ¶ 185(f); and signed the Company's annual Form 10-Ks for fiscal years 1998 through 2005, which included financial statements that failed to account for the backdated stock options, CAC ¶ 185(g). Plaintiffs claim that all the members of the Board are "hopelessly conflicted" because any suit by the Board to remedy the wrongs complained of in the present action would expose the members of the Board to suits for proxy violations and securities fraud. CAC ¶ 185(f), (g).

The argument that demand should be excused because the directors would otherwise have to sue themselves, thereby placing the conduct of the litigation in hostile hands and preventing its effective prosecution, has been made to, and dismissed by, numerous courts. See, e.g., Aronson, 473 A.2d at 818. It is true that the basic test of demand futility evolved because "[w]here the board's actions cause the shareholder complaint, 'a question is rightfully raised over whether the board will pursue these claims with 100% allegiance to the corporation, since doing so may require that the board sue itself on behalf of the corporation.'" Ryan v. Gifford, 918 A.2d 341, 352 (Del. Ch. 2007) (quoting Sanders v. Wang, 1999 WL 1044880, at *4 (Del. Ch., Nov. 8, 1999)). However, a plaintiff may not "bootstrap allegations of futility" by pleading that "the directors participated in the challenged transaction or that they would be reluctant to sue themselves." Blasband v. Rales, 971 F.2d 1034, 1049 (3rd Cir. 1992).

"Unless facts are alleged with particularity to overcome the presumptions of independence and a proper exercise of business judgment, in which case the directors could not be expected to sue themselves, a bare claim of this sort raises no legally cognizable issue under Delaware corporate law." Aronson, 473 A.2d at 818. Thus, the

United States District Court
For the Northern District of California

1    mere threat of personal liability for approving a questioned transaction, standing alone, is

2    insufficient to challenge the disinterestedness of directors.  Ryan, 918 A.2d at 355.

3          A plaintiff can overcome the presumption of director disinterestedness only with

4    particularized facts indicating that the director's actions were "so egregious that a

5    substantial likelihood of directorial liability exists."  In re Silicon Graphics, 183 F.3d at 990

6    (quoting Aronson, 473 A.2d at 805).  A showing that the potential for liability rises to a

7    "substantial likelihood" requires particularized factual allegations "detailing the precise roles

8    that these directors played at the company, the information that would have come to their

9    attention in these roles, and any indication as to why they would have perceived the

10   [wrongdoing]."  Guttman, 823 A.2d at 503.  Here, however, plaintiffs fail to plead

11   particularized facts raising a reasonable doubt that a majority of the Board face a

12   substantial likelihood of liability.

13         For example, plaintiffs' generalized allegations that the director defendants

14   breached fiduciary duties are insufficient to demonstrate that any director engaged in

15   conduct that resulted in a substantial risk of personal liability.  In re Silicon Graphics, 183

16   F.3d at 990.  In addition, as explained below in the discussion of the substantive claims, the

17   cause of action alleging false or misleading proxy solicitations is time-barred, and plaintiffs

18   fail to plead fraud with particularity in any of their substantive causes of action.  Having

19   failed to state a claim for proxy violations or securities fraud, plaintiffs cannot use those

20   causes of action as a basis for alleging demand futility.

21         As for the stock option grants, plaintiffs make only the conclusory assertion that all

22   the directors "authorized, approved, [or] ratified" the backdating.  It is true that "[a] director

23   who approves the backdating of options faces at the very least a substantial likelihood of

24   liability," and that "[b]ackdating options qualifies as one of those 'rare cases [in which] a

25   transaction may be so egregious on its face that board approval cannot meet the test of

26   business judgment.'"  Ryan, 918 A.2d at 355-56 (quoting Aronson, 473 A.2d at 815).

27   However, the CAC alleges no particularized facts supporting such a claim, and provides no

28   explanation as to which of the directors are alleged to have "authorized" the backdated

                                            22

United States District Court

For the Northern District of California

grants, which are alleged to have "approved" the backdated grants, or which are alleged to have "ratified" the backdated grants – or what form such authorization or approval or ratification supposedly took.

In this case, as noted by VeriSign, six of the eleven directors could not have been involved in authorizing or approving the backdating because any decision to issue backdated grants took place before the commencement of their tenure on the Board.[12] Moreover, "[i]t is no answer to say that demand is necessarily futile because . . . the directors . . . approved the underlying transaction." Brehm, 746 A.2d at 257 n.34.  As for "ratifying" backdated grants, that could mean any number of things – "post hoc approval, willingness to participate in a coverup, or knowing that the grants were backdated, or any number of transgressions." In re CNET, 483 F.Supp. 2d at 963.

Plaintiffs suggest that under Ryan, a mere allegation that a company granted backdated options is sufficient to excuse demand.  However, the facts in Ryan are distinguishable from the facts in the present case.  In that case, six directors sat on the board, but the three-member compensation committee, not the entire board, approved the backdated options.  The court nevertheless found that the decision to grant backdated options could be imputed to the entire board, because one-half of the current board members (the three committee members) had approved each challenged transaction. Thus, the court applied the Aronson test, and found that the allegations of "knowing and intentional violations of the stock option plans" raised a reason to doubt that the challenged transactions could result from a valid exercise of business judgment. Ryan, 918 A.2d at 354.  In addition, the court found that demand would be futile under the Rales test, because the three directors who served on the compensation committee and approved the backdating faced "at the very least a substantial likelihood of liability." Id. at 355.

---

[12]  It is true that Moore joined the Board some time in February 2002, and the latest backdating allegedly occurred with regard to options purportedly granted on February 21, 2002.  However, plaintiffs allege no facts indicating that Moore participated in any scheme to backdate options, and concede in their opposition to VeriSign's motion that Moore is "not implicated in [the] list of interested directors." Pltfs' Opp. at 16 n.17.

United States District Court

For the Northern District of California

1   Here, by contrast, the CAC contains no particularized allegations stating which

2   director or directors approved which grant, or when such grant was approved and how it

3   was backdated – and no allegations showing how or why a particular director would know

4   that the options were backdated.  Moreover, while it is not clear from the CAC whether the

5   Board approved the option grants, it appears that a majority of the current members of the

6   Board were not directors at the time of the alleged backdating.

7   *Service on Board committees*

8   Plaintiffs allege that the Board's Compensation Committee, Audit Committee, and

9   Nominating and Corporate Governance Committee "set the policies which permitted the

10   backdating of options to occur."  CAC ¶ 90.  Among other things, plaintiffs assert that the

11   Compensation Committee was responsible for setting salaries and other compensation of

12   the executive officers, and administering the stock option and other employee equity and

13   bonus plans, CAC ¶ 92, and that the Compensation Committee "granted" the stock options

14   to the option defendants, CAC ¶ 117.  They assert further that the Audit Committee was

15   obligated to exercise oversight over the Company's financial reporting and controls, CAC

16   ¶ 95; and that the Nominating and Corporate Governance Committee was charged with

17   considering the performance and qualifications of each potential Board nominee, and with

18   annually reviewing the performance of the Board, CAC ¶ 101.

19   Of the Board as constituted as of July 5, 2006, plaintiffs assert that Sclavos, Bidzos,

20   Chenevich, Reyes, Lauer, and Simpson were members of the Compensation Committee at

21   various times, CAC ¶¶ 9, 44, 46, 52, 55, 58, 93; that Chenevich, Kriens, Muller, and Roper

22   were members of the Audit Committee at various times, CAC ¶¶ 46, 51, 54, 56, 96; and

23   that Bidzos and Kriens were members of the Nominating and Corporate Governance

24   Committee at various times, CAC ¶¶ 51, 100.  Plaintiffs assert that the Board "should have

25   been aware" that VeriSign used different measurement dates when computing

26   compensation costs for certain stock option grants; and claim that under the charters and

27   policies of these three Committees, the directors had an obligation to investigate the

28   difference in measurement dates and recorded dates of option grants.  CAC ¶ 102.

United States District Court

For the Northern District of California

These allegations are wholly insufficient to support a claim of demand futility. First, as previously discussed, the CAC is not consistent in alleging the dates of service of various directors on the Compensation Committee. That is a minor point, however, except insofar as it reflects the CAC's lack of organizational integrity. More significant is the fact that of the eight directors alleged to have served on one or more of the three Committees, four – Lauer, Mueller, Roper, and Simpson – joined the Board after the end of the alleged backdating. Thus, their membership in the various Committees does not create a reasonable doubt that those four directors are disinterested.

In addition, plaintiffs plead only conclusory allegations regarding Committee service. "Mere membership on a committee or board, without specific allegations as to defendants' roles and conduct, is insufficient to support a finding that the directors were conflicted." In re CNET, 483 F.Supp. 2d at 963. Here, the CAC alleges no facts explaining the role, if any, that each director played in the alleged wrongdoing, in terms of his service on one or more of the Committees.

Most notably, the court was unable to locate any reference in the CAC to a connection between the activities of the Nominating and Corporate Governance Committee and the members thereof, and the alleged wrongdoing. It also appears that plaintiffs have attempted to blur the distinction between the Compensation Committee (responsibility for administering and approving option grants) and the Audit Committee (different responsibilities, but no role in option awards). The CAC also provides no basis for inferring that the members of the Audit Committee had any knowledge of the alleged backdating, or any knowledge of deficiencies in the Company's public filings.

*Failure to take action*

Plaintiffs allege that a demand on the Board would have been futile because the directors "through abdication of duty, permitted the wrongs alleged herein to have occurred," CAC ¶ 185(h); because the directors have not "recommended that any defendant be relieved of his or her duties as director," CAC ¶ 185(j); and because the directors "did not require that the [o]ption [d]efendants immediately disgorge all of their ill-

United States District Court

For the Northern District of California

1   gotten gains from their improper manipulation of their stock option grants, did not require

2   them to return all unexecuted stock options to the Company, and did not require them to

3   disgorge their bonuses and equity-based compensation to the Company, . . . [and] did not

4   take any other action, including commencing legal proceedings, to protect the interests of

5   the Company," CAC ¶ 185(k).

6          Such boilerplate allegations that the directors are not independent because they

7   failed to act or assert claims against certain defendants are not sufficient to establish

8   demand futility, for two reasons.  First, plaintiffs make this argument with regard to the

9   entire Board, and not as to the individual directors.  Thus, it cannot be used to support an

10  assertion that a particular director was "interested" or conflicted.

11         Second, as VeriSign notes in its moving papers, such allegations essentially

12  constitute an attempt to plead a claim of "failure of oversight."[13]  When pled as a separate

13  cause of action, such a claim is "possibly the most difficult theory in corporation law upon

14  which a plaintiff might hope to win a judgment."  In re Caremark Int'l, Inc. Derivative Litig.,

15  698 A.2d 959, 967 (Del. Ch. 1996).  Such a claim requires a showing, for example, that a

16  company's board of directors or a board committee met only sporadically or devoted

17  patently inadequate time to its work, or that the board or a committee had clear notice of

18  wrongdoing and simply chose to ignore that evidence.  See Guttman, 823 A.2d at 505-07.

19         Here, the CAC pleads no particularized facts showing how or when any of the

20  directors knew of the alleged option backdating practices in question, or that they

21  intentionally backdated any option grants.  Moreover, plaintiffs' assertion that the Board has

22  taken no action is contradicted by VeriSign's announcements, in June 2006 and after, that

23  it was conducting an internal review of the options grants, with the assistance of

24  independent legal counsel.

25  / / /

26

27  _____

28         [13]  In their opposition to VeriSign's motion, plaintiffs assert that the "failure to exercise oversight" allegations establish a "substantial likelihood of personal liability" – though that is clearly not how it is pled in the CAC.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii.     Whether the directors are independent

Directorial "independence" exists when a director's decision is based on "the corporate merits of the subject before the board" rather than on "extraneous considerations or influences." Aronson, 473 A.2d at 816.  When lack of independence is charged, the plaintiff must allege particularized facts showing either that the board is dominated by an officer or director who is the proponent of the challenged transaction, or that the board is so under his influence that its discretion is "sterilize[d]." Rales, 634 A.2d at 936.  If a director is considered "controlled" by another, interested, director, he or she is lacking in the independence necessary to consider the challenged transaction objectively.

> A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will.  A director may also be considered "controlled" if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.

Telxon Corp. v. Meyerson, 802 A.2d 257, 264 (Del. 2002) (citation omitted).

Plaintiffs argue that because Sclavos is President and CEO of the Company, he cannot be considered to be acting independently, considering his considerable financial stake in maintaining his current offices and position.  Plaintiffs also allege in the CAC that the members of the Board are personally and professionally entangled with certain of the other defendants, or are implicated in stock option backdating at other companies, and are therefore lacking in the independence necessary to consider or take necessary and proper action on the Company's behalf.

VeriSign argues that none of these allegations is sufficient to establish lack of independence.  VeriSign asserts that plaintiffs have pleaded no particularized facts demonstrating that any single director has or had control over any other director, and submits that the vague allegations of "friendship" or business relationships are not sufficient to excuse demand.  VeriSign also notes that many of the allegations do not even claim any sort of relationship between the directors mentioned, but rather simply indicate that they

United States District Court

For the Northern District of California

1 had some sort of overlapping tenure at a particular company.

2       VeriSign contends that the fact that several directors also sit together on the boards

3 of other companies does not itself establish lack of independence. Similarly, VeriSign

4 contends that boilerplate allegations that directors are not independent because they have

5 served as directors or employees at other companies where option backdating issues

6 purportedly have arisen are insufficient. VeriSign notes that plaintiffs provide no specifics

7 whatsoever regarding those defendants' alleged "implication" in other options backdating,

8 and make no connection between events at other companies and events at VeriSign.

9                               *Sclavos' position as President and CEO*

10       Plaintiffs argue in their opposition to VeriSign's motion that Sclavos' position as

11 President and CEO of VeriSign, and the fact that he receives substantial financial

12 compensation from his position, are sufficient to raise a reasonable doubt regarding his

13 independence from other board members. Plaintiffs claim that Sclavos cannot be

14 considered to be acting independently, considering his substantial financial stake in

15 maintaining his current offices and position.

16       Because plaintiffs did not include these assertions in their demand futility allegations,

17 the court need not consider them here. The court simply notes that demand futility cannot

18 be pled merely on the basis of allegations that directors were paid for their service, and

19 acted or would act to preserve their positions. Grobow v. Perot, 539 A.2d 180, 188 (Del.

20 1988), overruled on other grounds by Brehm, 746 A.2d 244. Some Delaware courts have

21 held that where a director's position in the corporation provides him his principal

22 employment and salary, it might be reasonable to infer that a director's ability to impartially

23 consider a demand is compromised. See, e.g., In re Limited, Inc., 2002 WL 537692, at *5

24 (Del. Ch., March 27, 2002) (where a director also serves as a high-ranking executive, with

25 a substantial compensation package, "[i]t is reasonable to infer that compensation of this

26 magnitude is material. . . . [A]s a general matter, compensation from one's principal

27 employment is 'typically of great consequence' to the employee'"). Here, however, the

28 CAC alleges no particularized facts establishing that Sclavos lacks independence based on

**United States District Court**

For the Northern District of California

1    his executive compensation.

2                                    *Personal relationships*

3         Plaintiffs allege, based on a report in the <u>San Jose Mercury News</u>, that Reyes and

4    Sclavos are personally involved with each other because they are friends.  CAC ¶ 191(b).

5    Plaintiffs also claim that Reyes, Sclavos, and Compton have been part owners of the San

6    Jose Sharks (professional ice hockey team) during the same or overlapping time periods

7    since 2002.  CAC ¶ 191(j).

8         When a complaint alleges lack of independence based on a relationship between

9    directors, the court must review the complaint to see whether it states with particularity

10   facts indicating that the director's independence may reasonably be doubted – either

11   because of "financial ties, familial affinity, a particularly close or intimate personal or

12   business affiliation, or because of evidence that in the past the relationship caused the

13   director to act non-independently vis à vis an interested director."  <u>Beam</u>, 845 A.2d at 1051.

14        However, mere allegations that directors move in the same social circles, or a

15   characterization that they are friends, is not sufficient to negate a director's independence

16   for demand excusal purposes.  <u>Id.</u> at 1051-52; <u>see also</u> <u>Litt v. Wycoff</u>, 2003 WL 1794724,

17   at *4 (Del. Ch., March 28, 2003) (allegation of mere personal friendship with interested

18   director is insufficient to raise reasonable doubt as to second director's independence);

19   <u>Benerofe v. Cha</u>, 1998 WL 83081, at *3 (Del. Ch., Feb. 20, 1998) (conclusory allegation of

20   long-standing friendship is not enough to raise a reasonable doubt about director's ability to

21   exercise his judgment independently of his friend).

22            [F]or presuit demand purposes, friendship must be accompanied by
             substantially more in the nature of serious allegations that would lead to a
23           reasonable doubt as to a director's independence. . . . To create a reasonable
             doubt about an outside director's independence, a plaintiff must plead facts
24           that would support the inference that because of the nature of the relationship
             or additional circumstances other than the interested director's stock
25           ownership or voting power, the non-interested director would be more willing
             to risk his or her reputation than risk the relationship with the interested
26           director.

27   <u>Beam</u>, 845 A.2d at 1052.

28        Here, the CAC alleges only that Sclavos, a presumably interested director, and

                                          29

**United States District Court**

For the Northern District of California

1   Reyes, an outside director, are friends; and that Sclavos, Reyes, and Compton, another

2   outside director, have at some unknown point been part owners of a sports franchise.  The

3   CAC pleads no facts showing that Sclavos controlled Reyes or Compton, or explaining how

4   or why Reyes and Compton would be unable to reach a decision independent of Sclavos or

5   each other.

6                                    *Business/employment connections*

7          Plaintiffs also assert that several of the directors are connected through business or

8   employment relationships.  They allege that Kriens has been Chairman and CEO of Juniper

9   Networks, Inc., since 1996, and Sclavos has been a board member at Juniper since 2000,

10   CAC ¶ 191(a); that Sclavos and Schaeffer both served as Vice Presidents at Tagilent, Inc.,

11   during the period 1993-1995, CAC ¶ 191(c); that Sclavos served as a board member at

12   Keynote Systems from April 1999 to December 2003, and Cowan has served as a board

13   member at Keynote since March 1998, CAC ¶ 191(d); that Korzeniewski served as CFO of

14   Network Solutions, Inc., from 1996 to 2000, when it was acquired by VeriSign, and Sclavos

15   served as a board member during the same or overlapping time periods, CAC ¶ 191(e);

16   that Evan and Compton have both served as board members at Logictier, Inc., and did so

17   during the same or overlapping time periods, CAC ¶ 191(f); that Schaeffer and Evan both

18   hold positions at Apple Computer and were employed by Apple during the same or

19   overlapping time periods, CAC ¶ 191(g); that Korzeniewski, Roper, and Simpson all held

20   executive positions at Science Applications International Corporation during the same or

21   overlapping time periods, CAC ¶ 191(h); and that Kremian and Moore both held senior

22   positions with Illuminet Holdings, Inc., and were employed by Illuminet during the same or

23   overlapping time periods, CAC ¶ 191(i).

24          An allegation that an interested director and other directors move in the same

25   business circles is not enough to negate a director's independence for pre-suit demand

26   purposes.  Beam, 845 A.2d at 1051-52.  Nor is the naked assertion of a previous business

27   relationship sufficient to overcome the presumption of a director's independence.  Orman v.

28   Cullman, 794 A.2d 5, 27 (Del. Ch. 2002).  Such allegations, without more, fail to raise a

**United States District Court**
For the Northern District of California

1    reasonable doubt that the director could not exercise his or her independent business

2    judgment in approving the transaction, and therefore lack the specific factual predicate

3    necessary to survive a motion to dismiss.  Id.

4         In their opposition to the motion, plaintiffs argue that a "history of personally

5    beneficial affiliation" or a clear pattern of mutual advantage between an interested director

6    and other directors serving on the board demonstrates lack of independence, and claim

7    that they have pleaded facts in the CAC demonstrating such beneficial affiliation or mutual

8    advantage by alleging the various business connections of some of the defendants.  In

9    support of their argument, plaintiffs cite In re Oracle Corp. Derivative Litig., 824 A.2d 917

10   (Del. Ch. 2003); Biondi v. Scrushy, 820 A.2d 1148 (Del. Ch. 2003); and Kahn v. Tremont

11   Corp., 1994 WL 162613 (Del. Ch., Apr. 21, 1994).  A look at the facts of these three cases

12   provides an indication of the level of financial and business interconnection that the

13   Delaware courts view as creating doubts about a director's independence.

14        In Oracle, the company's Special Litigation Committee ("SLC")[14] moved to terminate

15   the derivative action pending against certain Oracle directors and officers for insider

16   trading, so that the SLC could pursue the claims on behalf of Oracle.  The court found that

17   the SLC could not be considered "independent" because the two SLC members – both of

18   whom were professors at Stanford University – were being asked to investigate fellow

19   Oracle directors who also had important ties to Stanford.

20        Specifically, among the directors who were accused by the derivative plaintiffs of

21   insider trading were (1) another Stanford professor, who taught one of the SLC members

22   when he was a Ph.D. candidate and who served as a senior fellow and a steering

23   committee member alongside that SLC member at the Stanford Institute for Economic

24   Policy Research ("SIEPR"); (2) a Stanford alumnus who had directed millions of dollars of

25   contributions to Stanford during recent years, served as Chair of SIEPR's Advisory Board

26   ─────────────────

27        [14]  The court in Biondi noted that one of the purposes for forming a special litigation
     committee "is to promote confidence in the integrity of corporate decision making by vesting
28   the company's power to respond to accusations of serious misconduct by high officials in an
     impartial group of independent directors."  Biondi, 820 A.2d at 1156.

United States District Court

For the Northern District of California

1   and had a conference center named for him at SIEPR's facility, and had contributed nearly

2   $600,000 to SIEPR and Stanford Law School, both parts of Stanford with which one of the

3   SLC members was closely affiliated; and (3) Oracle's CEO, who had made millions of

4   dollars in donations to Stanford through a personal foundation and large donations

5   indirectly through Oracle, and who was considering making donations of his $100 million

6   house and $170 million for a scholarship program at Stanford as late as August 2001, at

7   around the same time period the SLC members were added to the Oracle board.  The

8   court found that taken together, those and other facts were sufficient to create a reasonable

9   doubt about the impartiality of the SLC.  In re Oracle, 824 A.2d at 920-21.

10       Biondi also involved a two-member SLC, appointed to investigate claims of insider

11   selling against several directors of HealthSouth Corporation, including HealthSouth's

12   Chairman and CEO, Richard M. Scrushy ("Scrushy").  Derivative suits had been filed

13   alleging that HealthSouth's directors had sold large blocks of stock while in possession of

14   the non-public knowledge that the Medicare reimbursement rate was about to be lowered,

15   which would materially lower HealthSouth's earnings.  The SLC sought a stay of the

16   derivative actions so that it could pursue its own investigation.

17       The court found that the two members of the SLC – Larry Striplin ("Striplin") and Jon

18   Hanson ("Hanson") – had compromising ties to Scrushy, including the fact that both Striplin

19   and Hanson served with Scrushy on the board of the National Football Foundation and

20   College Hall of Fame, Inc., of which Hanson had been the Chairman since 1994.  One of

21   that organization's key awards was named for HealthSouth, indicating to the court that the

22   company, under Scrushy's managerial leadership, had been quite generous with a cause

23   important to Hanson.  In addition, the court noted that Striplin and Scrushy were both large

24   contributors to college sports programs in Alabama, and that a stadium at a college in

25   Alabama had been named "Scrushy-Striplin Field."

26       The court noted further that the same day that the SLC was created with what the

27   court termed "questionable membership," HealthSouth hired the law firm of Fulbright and

28   Jaworski to investigate the securities trading issues that were at the heart of the pending

United States District Court

For the Northern District of California

derivative lawsuit – the issues supposedly being entrusted to the SLC.  Six days later, HealthSouth put out a press release quoting Scrushy's successor as CEO as making a statement purporting to exonerate Scrushy from the charges of insider selling – the charge that the SLC had just been formed to investigate.  Approximately a week later, HealthSouth announced the election of Robert P. May ("May") as an independent director, who soon became Chairman of the SLC upon Striplin's resignation.  When he resigned, Striplin issued a strong statement supporting Scrushy.

A month later, HealthSouth issued a press release announcing that Scrushy had been "cleared by outside investigation" (referring to a report issued by Fulbright and Jaworski) of advance knowledge of non-public material facts prior to the stock transactions. SLC Chairman May was quoted in the press release as stating that this outside review by Fulbright and Jaworski "puts to rest any question whether Mr. Scrushy had any inkling or knowledge of the Medicare reimbursement rule change or its impact" prior to his stock transactions.  Based on all these facts, the court concluded that the SLC could not meet its burden of showing its independence, and denied the request for a stay.  Biondi, 820 A.2d at 1156-58, 1165.

In Kahn, Tremont Corporation, which was under the control of its Chairman, Harold C. Simmons ("H.C. Simmons"), purchased 15% of the common stock of NL Industries, Inc. ("NL Industries" – also under H.C. Simmons' control) from Valhi, Inc. ("Valhi" – also under H.C. Simmons' control), for $96 million.  Prior to the challenged transaction, Valhi owned 62% of NL Industries' stock, and 44% of Tremont's stock.  Contran Corporation ("Contran") owned 90% of Valhi's stock.  Contran's outstanding stock was owned by a trust for the benefit of H.C. Simmons' children, of which he was the sole trustee.  Simmons was Chairman of Contran, Valhi, and NL Industries, and CEO of Contran and Valhi.

The NL Industries stock was unregistered, and could therefore not be resold in a public distribution.  The plaintiff in the subsequent shareholder derivative action alleged that Tremont had no legitimate business interest in spending $96 million, and that the transaction was conceived by Valhi solely for its benefit and that of H.C. Simmons, and that

United States District Court

For the Northern District of California

the purchase swiftly resulted in a large loss for Tremont.  The plaintiff asserted that pre-suit demand was futile because H.C. Simmons controlled a majority of the directors on the board and could not possibly show that the purchase would have been pursued by an independent board of directors of the company.

The defendants moved to dismiss for failure to make a pre-suit demand, arguing that the Tremont board of directors was independent and disinterested, that a committee of independent directors had negotiated the transaction under attack, that the board as a whole was not under the control of H.C. Simmons, and that pre-suit demand was not excused under Aronson.  The court found that the plaintiff had pleaded facts sufficient to create a reasonable doubt as to the board's disinterest and independence.

The court noted that two directors were officers of NL Industries in addition to being officers and directors of Tremont, and therefore owed their salaries from both companies to Valhi and to H.C. Simmons as controlling shareholder.  Thus, the court concluded, any unwillingness to cooperate by approving a transaction sponsored by Valhi might be thought to jeopardize more than simply their positions as directors of Tremont.  In addition, H.C. Simmons and two other directors were officers or directors of Valhi or Contran.  The court concluded that the plaintiff had met his burden of creating a reasonable doubt that a majority of Tremont's directors were interested in seeing the NL Industries stock purchase go through, and would not have entertained litigation over the matter.  Kahn, 1994 WL 162613, at *2-5.

In contrast to the particularized facts alleged in Oracle, Biondi, and Kahn, plaintiffs in the present case plead no facts showing interlocking financial obligations, no facts demonstrating that any director is dominated by an officer or director who is a proponent of the challenged transaction, and no facts establishing that any director is so "beholden" to a controlling director or majority shareholder – whether for financial, professional, or any other reason – that his or her discretion would be "sterilized."  See Rales, 634 A.2d at 936.

Indeed, the CAC does not even identify a controlling or dominating person or persons, but simply asserts that the "members of the Board are conflicted and entangled

United States District Court

For the Northern District of California

with certain of the other [d]efendants," and are therefore unable to fairly consider a demand

from the shareholders.  However, the alleged "entanglement" consists of nothing more than

simultaneous employment at a company other than VeriSign, or simultaneous service on

another company's board of directors.  Plaintiffs plead no facts establishing, for example,

that the mere fact that directors Roper and Simpson were formerly employed at SAIC

during a portion of the time period that option defendant Korzeniewski was employed at

SAIC means that Roper and Simpson could not impartially consider a demand from

VeriSign shareholders regarding the alleged backdated options.

Moreover, the CAC's mishmash of allegations regarding the purported

"entanglement" of the directors obscures the fact that half the defendants identified in

¶ 191 as having concurrently served on the boards of other companies, or as having been

employed by other companies during the same time period, are not even the directors

plaintiffs claim are lacking in independence.  Two of those defendants – Cowan and

Compton – are not current directors.  Three – Schaeffer, Korzeniewski, and Evan – are not

directors, but rather executives alleged to have received backdated options.  The only

defendants mentioned who are "current" VeriSign directors for purposes of the demand-

futility analysis are Sclavos, Kriens, Roper, Simpson, and Moore.  The allegations in the

CAC provide no substantial reason to question those  directors' impartiality and objectivity,

based on their employment or board service at companies other than VeriSign.

*Backdating at other companies*

Finally, plaintiffs allege that three directors – Kriens, Reyes, and Lauer – have each

been "implicated" in options backdating at other companies during the time each was

serving as the CEO of that company; and that three – Kriens, Sclavos, and Moore – have

been directors at companies that have been "implicated" in options backdating.

Specifically, plaintiffs allege that Kriens has been implicated in backdating at

Juniper, where he has been Chairman and CEO since October 1996, CAC ¶ 191(a); that

Kriens is a director of Equinix, Inc., a company "implicated" in the granting of backdated

options, CAC ¶ 191(l); that Sclavos has since 2001 been a board member of Intuit, a

United States District Court

For the Northern District of California

1    company "implicated" in the granting of backdated options, CAC ¶ 191(k); that Moore has

2    since 2000 been a director at Western Digital Corporation, a company that has admitted

3    backdating stock options and which is currently restating its financial results, and which

4    also utilized KMPG as its auditor, CAC ¶ 191(m); that Reyes has been charged with civil

5    and criminal securities fraud for the backdating of options while he was CEO of Brocade

6    Communications, Inc.,[15] and that KMPG was also Brocade's auditor from 2002 to 2006,

7    CAC ¶ 191(n); and that Lauer has been "implicated" in options backdating at Sprint Nextel

8    Corporation, where he was CEO until August 22, 2006, and that KMPG was Sprint's auditor

9    in 2004 and 2005, CAC ¶ 191(o).

10        With the exception of the allegations concerning Reyes, plaintiffs plead no

11   particularized facts showing how these directors are alleged to be "implicated" in options

12   backdating at other companies.  Moreover, it is not clear that a correlation exists between a

13   given director's "implication" in options backdating at a company other than VeriSign, and

14   the proposition that the director is incapable of independently considering a demand by

15   VeriSign's shareholders free from "extraneous considerations or influences."  Aronson, 473

16   A.2d at 816.

17        Plaintiffs simply suggest that an agreement by a VeriSign director to sue the

18   individual defendants on the Company's behalf might be considered an "admission" that the

19   same conduct by that director at another company was unlawful.  That proposition is highly

20   speculative, surely does not qualify as a particularized fact, and seems irrelevant to the

21   question whether a director on the VeriSign Board is capable of acting independently of

22   other directors or majority shareholders at VeriSign.  The court remains at a loss as to how

23   the two concepts are connected.

24             c.    Standing

25        VeriSign argues that plaintiffs lack standing to bring this derivative suit, as they have

26   not adequately alleged ownership of VeriSign stock.  Under Rule 23.1, a plaintiff must

27   _____

28        [15]  After plaintiffs filed the present action, Reyes was convicted by a federal jury of
     securities fraud, in connection with options backdating at Brocade.

United States District Court

For the Northern District of California

1  allege that he/she/it "was a shareholder or member at the time of the transaction of which

2  the plaintiff complains."  Fed. R. Civ. P. 23.1.  A derivative plaintiff has no standing to

3  challenge option transactions that occurred prior to the time that plaintiff owned company

4  stock.  See In re Computer Sciences Corp. Derivative Litigation, __ F.R.D. __, 2007 WL

5  2274951, at *10 (C.D. Cal., July 24, 2007); see also Desimone v. Barrows, 924 A.2d 908,

6  924-27 (Del. Ch. 2007) (under Delaware law, "continuing wrong" doctrine does not afford

7  shareholder standing to challenge earlier wrongs that pre-date his/her stock ownership).

8       In the CAC, plaintiffs allege that they "have owned VeriSign stock during the

9  Relevant Period" (defined as January 1, 1998, to the present) "and continue to own the

10  Company's common stock."  The court finds, however, that plaintiffs have not adequately

11  pled their status as shareholders at all time relevant to the transactions challenged in the

12  CAC.  Accordingly, plaintiffs must unambiguously indicate in any amended complaint the

13  dates they purchased VeriSign stock, and whether they have continuously owned VeriSign

14  stock from the time of purchase up to the present.

15       3.      Individual Defendants' Motion

16       The individual defendants seek an order dismissing all claims asserted against

17  them.  Among other things, they contend that the CAC does not allege any basis for

18  awarding damages or injunctive relief against the individual defendants under federal

19  securities laws; that the element of reliance, required to support plaintiff's fraud theory

20  under both their federal and state law claims, is absent and cannot be alleged in good faith;

21  and that plaintiffs were on notice of the facts underlying their state law claims more than

22  four years before they sued, rendering all those claims time-barred.

23       Although the CAC must be dismissed as stated above, for failure to allege demand

24  futility and failure to allege standing to bring a derivative action on VeriSign's behalf, the

25  court also rules separately on the individual defendants' motion, so that any amended

26  complaint can also address the pleading deficiencies in the substantive causes of action.

27  The court finds that the individual defendants' motion must be GRANTED in part and

28  DENIED in part.

37

1          a.      Federal Claims

2          Defendants argue that the claims brought under the 1934 Securities Exchange Act

3   should be dismissed for failure to state a claim.  They contend that the seventeenth cause

4   of action, for violation of § 10(b) and Rule 10b-5, should be dismissed for failure to plead

5   fraud with particularity; that the eighteenth cause of action for violation of § 14(a) and Rule

6   14a-9 should be dismissed because plaintiffs do not identify any damages causally

7   connected to the proxy solicitations at issue; and that the nineteenth cause of action for §

8   20(a) control person liability should be dismissed because plaintiffs fail to plead a primary

9   violation under the Exchange Act.  Defendants also assert that each of these causes of

10  action should be dismissed because the claims are untimely.

11         Motions to dismiss Exchange Act claims are governed by the Private Securities

12  Litigation Reform Act of 1995 ("PSLRA"), enacted by Congress to remedy perceived

13  abuses in securities class action litigation.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

14  127 S.Ct. 2499, 2504 (2007).  Among other changes, the PSLRA "requires plaintiffs to

15  state with particularity both the facts constituting the alleged violation, and the facts

16  evidencing scienter." Id. (citing 15 U.S.C. § 78u-4(b)(1), (2); Ernst & Ernst v. Hockfelder,

17  425 U.S. 185, 194 & n.12 (1976)).

18                  i.      § 10(b) claim

19         Plaintiffs allege that the director defendants and Evan made false or misleading

20  statements in VeriSign's Form 10-K annual reports, filed with the SEC for fiscal years 2000

21  through 2005,[16] by representing that the 10-Ks complied with GAAS in reporting stock

22

23         [16] VeriSign's Form 10-K for fiscal year 2000, filed on March 28, 2001, was signed by
24  Sclavos, Evan, Bidzos, Chenevich, Compton, Cowan, Kriens, and Tomlinson.  The Form 10-K
    for fiscal year 2001, filed on March 19, 2002, was signed by Sclavos, Evan, Bidzos,
25  Chenevich, Compton, Cowan, Kriens, Moore, Reyes, and Tomlinson.  The Form 10-K for fiscal
    year 2002, filed on March 31, 2003, was signed by Sclavos, Evan, Bidzos, Chenevich,
26  Compton, Cowan, Kriens, Moore, and Reyes.  The Form 10-K for fiscal year 2003, filed on
    March 15, 2004, was signed by Sclavos, Evan, Bidzos, Chenevich, Compton, Kriens, Lauer,
27  Moore, Reyes, and Roper.  The Form 10-K for fiscal year 2004, filed on March 16, 2005, was
    signed by Sclavos, Evan, Bidzos, Chenevich, Compton, Kriens, Lauer, Moore, Reyes, and
28  Roper.  The Form 10-K for fiscal year 2005, filed on March 13, 2006, was signed by Sclavos,
    Evan, Bidzos Chenevich, Guthrie, Kriens, Lauer, Moore, Mueller, Reyes, Roper, and Simpson.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

option grants in the financial statements, CAC ¶¶ 119-123; by concealing in the SEC filings

that the stock options were priced at less than the fair market price of the stock on the date

of the grant, CAC ¶ 147; and by disseminating financial statements that improperly

recorded and accounted for allegedly backdated option grants, thereby understating

compensation expenses and overstating net income, CAC ¶¶ 148-149.

In the seventeenth cause of action, plaintiffs assert that the director defendants and

defendant Evan "knew or recklessly disregarded the fact that the Company's financial

statements were misleading," and that these misrepresentations artificially inflated the

value of VeriSign's stock by understating the compensation received by the option

defendants.  CAC ¶ 264.  They also claim that at the same time that the price of VeriSign's

stock was inflated due to improperly-accounted for stock options, defendants were "causing

VeriSign to repurchase its own stock at those inflated prices starting in 2001," thereby

violating § 10(b) and Rule 10b-5, and that VeriSign was injured because it purchased its

own stock at those inflated prices on the open market.  CAC ¶¶ 265-266.

The basis of plaintiffs' § 10(b) claim thus appears to be that Evan and the director

defendants misrepresented to the market that the stock options were being granted at fair

market value as of the date of the grant; that the value of VeriSign's stock was inflated

because of those misrepresentations; and that VeriSign then purchased its own stock on

the open market at that inflated price and was damaged thereby.

Defendants argue that the seventeenth cause of action should be dismissed for

failure to state a claim.  Under § 10(b), it is unlawful "to use or employ in connection with

the purchase or sale of any security registered on a national securities exchange or any

security not so registered, any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C.

§ 78j(b).

SEC Rule 10b-5, promulgated under the authority of § 10(b), makes it unlawful for

any person to use interstate commerce

(a)      To employ any device, scheme, or artifice to defraud,

United States District Court

For the Northern District of California

1

2

    (b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

3

4

    (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

5  17 C.F.R. § 240.10b-5.

6        To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege (1) a material

7  omission or  misrepresentation, or the use of a manipulative or deceptive device or

8  contrivance, (2) scienter, (3) a connection with the purchase or sale of a security,

9  (4) reliance, (5) economic loss, and (6) loss causation (a causal connection between the

10  misrepresentation or deceptive device and the loss).  See Dura Pharms., Inc. v. Broudo,

11  544 U.S. 336, 341-42 (2005).

12        Defendants contend that the CAC fails to state a claim under § 10(b) because

13  plaintiffs do not adequately plead the elements of the claim, and because the claim is time-

14  barred.  In opposition, plaintiffs assert that the CAC specifically alleges that defendants

15  committed a variety of manipulative and deceptive acts, including backdating option grants

16  and issuing false financial statements and proxy statements; that defendants' scheme was

17  in furtherance of their scheme to defraud the Company; and that defendants engaged in

18  their fraudulent scheme knowingly or recklessly.  They also assert that the claim is timely.

19  The court finds that the motion must be GRANTED.

20                                  *Falsity*

21        Under the PSLRA – whether alleging that a defendant "made an untrue statement of

22  a material fact" or alleging that a defendant "omitted to state a material fact necessary in

23  order to make the statements made, in the light of the circumstances in which they were

24  made, not misleading" – the complaint must specify each statement alleged to have been

25  false or misleading, specify the reason or reasons each such statement is misleading, and,

26  if an allegation regarding the statement or omission is made on information and belief,

27  "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1);

28  see also In re Silicon Graphics, 183 F.3d at 984-85 (plaintiffs must provide, in great detail,

United States District Court

For the Northern District of California

1    all the relevant facts forming the basis of allegations made on information and belief).

2         In this case, defendants assert, plaintiffs' allegation that the individual defendants

3    falsely backdated option grants is based on information and belief, as plaintiffs do not

4    allege that they have personal knowledge of any such backdating.  Defendants contend

5    that the only basis plaintiffs plead for this belief is the allegedly "striking" difference between

6    the buy-in price on the nominal grant dates and the share price one month after.

7    Defendants also argue that plaintiffs' claims are deficient because the CAC fails to specify

8    which of the individual defendants allegedly made the false and misleading statements.

9         The basis of plaintiffs' allegations of falsity appears to be that in signing the Form 10-

10   Ks, Evan and the director defendants misrepresented to VeriSign that the information in the

11   financial statements was accurate, which representation necessarily included an assurance

12   that the stock options were being granted at fair market value as of the date of the grant.  In

13   the CAC, plaintiffs assert that based on information released concerning the federal

14   investigation of VeriSign's option grants, and also based on VeriSign's announcement that

15   it would be late filing its Form 10-Q for the quarter ending June 30, 2006, "[t]he question of

16   whether or not VeriSign will issue a restatement [of financial statements] is only a matter of

17   when, not if."  CAC ¶¶ 113-114.

18        On November 21, 2006, the day that plaintiffs filed the CAC, VeriSign announced

19   that it had determined the need to restate its historical financial statements for the years

20   and interim periods from 2001 to 2005 and for the first quarter of 2006 to record additional

21   non-cash, stock-based compensation expense related to past stock option grants.

22   VeriSign stated that it had identified certain grants with incorrect measurement dates,

23   without required documentation, or with initial grant dates and prices that were

24   subsequently modified.

25        While it is true that the allegations of backdating are not pled with particularity – with

26   regard to, e.g., who was responsible for or authorized backdating, who knew about it, when

27   the options were granted, and what the price of the options should have been – the

28   misrepresentation alleged in the § 10(b) claim is directed instead toward the contents of the

United States District Court
For the Northern District of California

1   financial statements in VeriSign's 10-Ks.  In view of VeriSign's announcement of the

2   anticipated restatement of its financial statements to account for backdated options, the

3   court finds that plaintiffs need not allege additional facts to support their claim that

4   defendants issued false or misleading financial statements.

5                                            *Scienter*

6          The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong

7   inference that the defendant acted with the required state of mind."  15 U.S.C.

8   § 78u-4(b)(2).  In the Ninth Circuit, "stat[ing] facts [with] particularity" is interpreted as a

9   requirement that plaintiffs "plead, in great detail, facts that constitute strong circumstantial

10  evidence of deliberately reckless or conscious misconduct."  In re Silicon Graphics, 183

11  F.3d at 974; see also In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 846 (9th Cir. 2003)

12  (plaintiff must allege specific contemporaneous statements or conditions, known to

13  defendant, that demonstrate intentional or deliberately reckless false or misleading nature

14  of statements when made).

15         In determining whether plaintiffs' scienter allegations reach the level of a "strong

16  inference," the district court "must consider all reasonable inferences to be drawn from the

17  allegations, including inferences unfavorable to the plaintiffs."  Gompper v. VISX, Inc., 298

18  F.3d 893, 896-97 (9th Cir. 2002) (also noting the "inevitable tension . . . between the

19  customary latitude granted the plaintiff on a [12(b)(6)] motion to dismiss . . . and the

20  heightened pleading standard set forth under the PSLRA").  In other words, the court must

21  consider "not only inferences urged by the plaintiff, . . . but also the competing inferences

22  rationally drawn from the facts alleged."  Tellabs, 127 S.Ct. at 2504.  To qualify as "strong,"

23  an inference of scienter "must be more than merely plausible or reasonable – it must be

24  cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Id.

25         Defendants assert that the CAC does not meet the PSLRA's stringent standard for

26  pleading scienter, because plaintiffs rely on boilerplate assertions rather than particularized

27  allegations, and because they cite to no sources of information or any contemporaneous

28  documents that support their claims.  Specifically, defendants argue, plaintiffs plead no

United States District Court

For the Northern District of California

1    facts indicating how the director defendants and Evan were supposed to have known of the

2    alleged backdating or of the accounting impact of such alleged actions.  Defendants

3    contend that it is not enough for plaintiffs to allege, as they have, that defendants "must

4    have known" or "could have known" of fraud based on their job titles or job duties, in light of

5    the PSLRA's requirement that plaintiffs plead specific facts, not boilerplate.

6         In opposition, plaintiffs argue that the CAC adequately pleads scienter by alleging,

7    among other things, that dozens of VeriSign stock option grants were backdated, that such

8    backdating violated the express provisions of the Company's shareholder-approved stock

9    option plans, that the backdating occurred over an extended time period, and that each

10   time the price of VeriSign's stock rose significantly after the alleged grant.  Plaintiffs claim

11   that these facts alone support a strong inference that those who received backdated

12   options, as well as those who granted, reviewed, or approved them, did so either knowingly

13   or recklessly.

14        Plaintiffs assert that the CAC alleges how each of the individual defendants

15   participated in the backdating scheme either with knowledge or reckless disregard for their

16   wrongful actions; and also alleges that the director defendants, at the behest of the option

17   defendants, actually backdated the option grants.  Plaintiffs also claim that the CAC

18   specifically alleges the role of the Compensation Committee in the backdating scheme, as

19   well as the role of the Audit Committee; and that the CAC alleges that the defendant-

20   insiders sold over $1 billion of VeriSign stock while in the possession of knowledge about

21   the backdated stock option grants.  Plaintiffs insist that defendants "cannot seriously

22   dispute" that these defendants had full knowledge of the backdating, or that such

23   backdating violated the shareholder-approved plans that were described as requiring option

24   grants at or above the current market prices of VeriSign stock in the proxy statements that

25   all the director defendants signed.

26        The court finds that the CAC fails to allege, with respect to each defendant, facts

27   giving rise to a strong inference that each such defendant acted with deliberate

28   recklessness or engaged in conscious misconduct.  While it is true that the CAC pleads

43

1   numerous "facts," those facts are little more than generalities – that dozens of options were

2   backdated, that such alleged backdating violated the applicable option plans, that the

3   alleged backdating occurred on multiple occasions, and that the VeriSign stock price rose

4   after the alleged grants.

5          It is not true, as plaintiffs claim, that the CAC alleges how <u>each</u> individual defendant

6   participated in the alleged "backdating scheme."  For example, the CAC alleges no facts

7   giving rise to a strong inference that the director defendants who joined VeriSign's Board

8   after the alleged backdating – Guthrie, Lauer, Moore, Mueller, Roper, and Simpson –

9   participated in a backdating scheme.  As for Evan and the remaining director defendants –

10  Bidzos, Chenevich, Cowan, Kriens, Reyes, Tomlinson, and Compton – their participation

11  during the time of the option grants is pled without factual particularity.

12         Plaintiffs simply allege that Evan and all the director defendants "disseminated or

13  approved financial statements that did not disclose the backdating practices that were

14  occurring at VeriSign and the resulting effect of those practices on the Company's financial

15  results," and that they "knew or recklessly disregarded the fact that the Company's financial

16  statements were misleading."  CAC ¶ 264.  Plaintiffs also assert that the members of the

17  Compensation Committee and the Board "by its approval of their recommendations,"

18  enabled or permitted the Company to backdate stock options granted to the option

19  defendants.  CAC ¶ 185(c).

20         These allegations do not satisfy the pleading requirements of the PSLRA because

21  plaintiffs neither specify the roles that Evan and each of the director defendants played in

22  the alleged backdating scheme or in the alleged scheme to issue false financial reports, nor

23  allege facts giving rise to a strong inference of scienter as to <u>each</u> defendant.  <u>See</u> <u>In re</u>

24  <u>Atmel Corp. Derivative Litig.</u>, 2007 WL 2070299, at *6 (N.D. Cal., July 16, 2007).  It is not

25  sufficient under the PSLRA to allege scienter against defendants as a group.  <u>See</u> 15

26  U.S.C. § 78u-4(b)(2) (plaintiff must "state with particularity facts giving rise to a strong

27  inference that the defendant acted with the required state of mind").

28         The assertions of scienter are entirely conclusory, and the CAC contains no specific

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

allegations of contemporaneous reports or data supporting the assertions of scienter – not a single fact showing what each defendant knew, when he/she knew it, or how he/she acquired that knowledge.  This lack of factual specificity is particularly striking because none of the director defendants is alleged to have received any of the backdated options.

The mere fact of a particular defendant's position within VeriSign is insufficient, without more, to impose liability.  See, e.g., In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1087 (9th Cir. 2002).  "[A] complaint does not adequately plead scienter by claiming that key officers knew the true facts by virtue of their 'hands-on' positions and involvement in the day-to-day management of the company."  In re Peerless Systems Corp. Sec. Litig., 182 F.Supp. 2d 982, 993 (S.D. Cal. 2002).  Nor is the boilerplate allegation that "[t]he director defendants and Evan knew or recklessly disregarded the fact that the Company's financial statements were misleading," CAC ¶ 264, sufficient to state a claim.

Moreover, plaintiffs' arguments of "motive and opportunity," relating to sales of stock, are not considered adequate in the Ninth Circuit.  See In re Silicon Graphics, 183 F.3d at 974.  Plaintiffs contend that courts have held that an inference of scienter can be raised by stock sales significantly smaller than the stock sales at issue here.  However, the cases on which they rely – Fecht v. Price Co., 70 F.3d 1078, 1084 (9th Cir. 1995), and Rubenstein v. Collins, 20 F.3d 160, 169 (5th Cir. 1994) – both pre-date the effective date of the PSLRA, and are therefore not controlling.  The Ninth Circuit has noted that insiders often sell stock for a variety of reasons having nothing to do with fraud, and has concluded that even large stock sales, without more, cannot give rise to a strong inference of scienter.  See, e.g., In re Vantive, 283 F.3d at 1093; Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001).

Finally, the mere fact that a corporation restates its financial statements does not give rise to a strong inference that any individual defendant acted with intent to defraud.  See DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002) (publication of inaccurate accounting figures, or failure to follow GAAP, standing alone, is insufficient to establish scienter).

/ / /

United States District Court

For the Northern District of California

*Loss causation*

Defendants contend that plaintiffs' theory that VeriSign was damaged by "inflated stock prices" does not satisfy the economic loss element of a § 10(b) claim.  In Dura, the Supreme Court ruled that purchasing a stock at an inflated price does not constitute a loss, because the purchaser then owns a stock that is priced at the inflated prices.  Dura, 544 U.S. at 342.  The Court concluded that the complaint was properly dismissed where the sole allegation of economic loss was the claim that the plaintiff had purchased at an inflated price.  Id. at 346-47.

Here, the CAC alleges loss under § 10(b) based solely on VeriSign's "repurchase of its own stock on the open market at inflated prices starting in 2001."  CAC ¶ 265.  Defendants note that plaintiffs have not alleged that VeriSign lost money on the repurchased shares, or that the Company's stock price declined following a disclosure of backdating.  Indeed, defendants argue, plaintiffs do not allege any "disclosure" of backdating at all, and the only basis they allege for their belief that the option grants were backdated is the "striking" difference between the buy-in price on the nominal grant dates and the share price approximately one month later.  Thus, defendants contend, plaintiffs have failed to allege economic loss.

In opposition, plaintiffs contend that the CAC adequately pleads economic loss and loss causation, by alleging that VeriSign's stock price dropped after disclosure of the simultaneous resignations of defendants Reyes and Lauer from VeriSign's Board.[17]  Plaintiffs argue that it is this price drop that satisfies the requirements for pleading loss causation and economic loss.

In order to plead loss causation, a plaintiff need only allege that the loss resulted from a stock price drop caused by revelation of the "relevant truth" – that is, true facts about the Company's financial condition or performance that defendants had concealed.  Dura, 544 U.S. at 342-46.  Plaintiffs assert, however, that it is not necessary that there be a true

_____

[17] VeriSign made the announcement in a Form 8-K filed on August 2, 2006.  The resignations were effective July 31, 2006.

46

1    "corrective disclosure," but rather that the market could learn about the possible fraud

2    through a number of sources spread out through a period of time, during an investigation or

3    because of resignations.  Plaintiffs claim that the allegations of market knowledge through

4    the resignation of key directors, followed by a drop in the price of the stock, are sufficient to

5    adequately allege economic loss.

6         The court finds that the CAC fails to plead facts showing economic loss or loss

7    causation.  Indeed, as defendants have pointed out, it is questionable whether plaintiffs will

8    ever be able to allege loss causation, because VeriSign's stock price went up, not down,

9    after the June 27, 2006, announcement of the grand jury subpoena, the inquiry from the

10   SEC, and the announcement of the internal review of stock option practices by VeriSign's

11   board of directors.  Similarly, the stock price went up, not down, after VeriSign's November

12   21 and 22, 2006, announcements of the preliminary results of the directors' review of the

13   stock option grants, and its statement of its intent to restate its 2001-2005 financial

14   statements to record $250 million in non-cash, stock-based compensation expense.

15        The announcement of the resignations of Reyes and Lauer is meaningless for

16   purposes of showing loss causation, as the announcement was made more than five

17   weeks after the announcement of the grand jury subpoena and the SEC investigation.

18   That initial disclosure on June 27, 2006, constituted "disclosure to the market," and plaintiffs

19   cannot claim that the market was unaware of these facts until Reyes and Lauer resigned

20   weeks later.  Moreover, plaintiffs do not explain the connection – if any – between the

21   resignations and the alleged fraudulent backdating of options.  In particular, there is no

22   indication in the CAC that VeriSign announced that Reyes and Lauer had resigned

23   because they were involved in options backdating at VeriSign.

24                                    *Reliance*

25        Defendants argue that plaintiffs cannot plead reliance under their theory of the

26   § 10(b) claim, because the individuals who were allegedly responsible for VeriSign's

27   repurchase of its shares – the director defendants and Evan – are the same individuals

28   who were responsible for VeriSign's allegedly false financial statements, and who "knew or

United States District Court
For the Northern District of California

1    recklessly disregarded the fact that the Company's financial statements were misleading."

2        Reliance cannot be established when the individual allegedly acting on a

3    misrepresentation "already possesses information sufficient to call the representations into

4    question." Atari Corp. v. Ernst & Whinney, 981 F.2d 1025, 1030 (9th Cir. 1992).

5    Defendants assert that plaintiffs' theory that VeriSign relied on the allegedly misleading

6    financial statements when it repurchased the shares is untenable, in view of plaintiff's

7    allegation that the individuals making the repurchase decisions already knew – and indeed

8    were responsible for – the issuance of misleading financial statements.

9        In opposition, plaintiffs contend that the complaint adequately pleads reliance.  They

10   argue that defendants' argument – that the individual defendants' knowledge of the

11   impropriety of the buy-backs is attributable to the Company – is without merit.  They

12   contend that if it were true, a corporation could never sue its fiduciaries for fraud, because

13   officers and directors could always argue that their knowledge of wrongdoing must

14   somehow be attributed to the corporation.

15       Plaintiffs argue that the individual defendants took ultra vires actions contrary to the

16   authorization provided by the Company's stock option plans, and adverse to the interests of

17   the Company, and assert that under such circumstances, the individual defendants'

18   knowledge cannot be imputed to the Company.  They contend that taking defendants'

19   argument to its logical end would allow corporate officers to mislead their corporation and

20   then escape derivative liability to the corporation precisely because they misled the

21   corporation.

22       The court finds that plaintiffs fail to plead facts showing reliance.  As with loss

23   causation, it may prove impossible for plaintiffs to adequately plead reliance under the facts

24   of the case.  Plaintiffs allege that "VeriSign would not have purchased VeriSign common

25   stock at the prices it paid, had the market previously been award [sic] that the market price

26   of VeriSign's stock was artificially and falsely inflated by defendants' misleading statments."

27   CAC ¶ 266.  However, the CAC does not identify a single VeriSign officer or director who

28   relied on the supposedly false or misleading financial statements in deciding to undertake

48

United States District Court

For the Northern District of California

the stock repurchase on VeriSign's behalf.[18]

Plaintiffs might be able to plead reliance if they were to allege that the corporate decision-maker for the repurchase of shares had no knowledge of the alleged fraud.  Here, however, plaintiffs allege that all the senior management and board members not only knew about the alleged backdating but also caused it, and that all the director defendants and Evan intentionally caused VeriSign to release financial statements that omitted to disclose the alleged backdating.

*Timeliness*

In addition to pointing to the pleading deficiencies, defendants contend that the § 10(b) claim must be dismissed as untimely.  They assert that plaintiffs were on notice of the facts upon which they base their claim of backdating no later than one month after each grant date, and more than two years before they filed the complaint.

The limitations period for a § 10(b) claim is "the earlier of (1) 2 years after the discovery of the facts constituting the violation, or (2) 5 years after such violation."  28 U.S.C. § 1658(b).[19]  The Ninth Circuit has not yet addressed whether "discovery of the facts constituting the violation" requires a plaintiff's discovery of a misrepresentation, or simply that the plaintiff was put on inquiry notice of the misrepresentation.  See Berry v. Valence Tech., Inc., 175 F.3d 699, 703-04 (9th Cir. 1999); accord, Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 951 (9th Cir. 2005).

The Ninth Circuit has indicated, however, that if it were to adopt an "inquiry notice" standard, it would be in the following formation – whether a plaintiff, in the exercise of

---

[18] The CAC does not even plead facts indicating when the alleged "repurchase" of stock "on the open market" occurred.

[19] This provision is properly considered a statute of repose.  Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363 (1991) (construing the former statute, which imposed a one- and three-year limitation).  A statute of limitations differs from a statute of repose because the former "bars plaintiff[s] from bringing an already accrued claim after a specified period of time," whereas the latter "terminates a right of action after a specific time, even if the injury has not yet occurred." Fields v. Legacy Health System, 413 F.3d 943, 952 (9th Cir. 2005) (citation omitted).  The statute of repose applicable to claims under the Exchange Act is not subject to equitable tolling.  Lampf, 501 U.S. at 363.

49

United States District Court

For the Northern District of California

1   reasonable diligence, should have uncovered the facts underlying the fraud. Berry, 175

2   F.3d at 704.  In any event, defendants assert that in this case, the "inquiry notice" and the

3   "actual discovery" standards will lead to the same result.

4        Defendants contend that plaintiffs were on notice of the facts on which they base

5   their claims of backdating no later than one month after each grant date – meaning that

6   they were aware of the alleged misrepresentations no later than March 31, 2003.  They

7   claim that because this difference was public and obvious at the time, plaintiffs had both

8   actual and inquiry notice of the facts underlying their backdating allegations no later than

9   one month following the last nominal grant date – which was March 2002.  Thus,

10  defendants contend, the two-year statute of limitations began to run on the filing date of the

11  first financial statement filed after March 2002, which was March 31, 2003.  As this was

12  more than two years before the first complaint was filed in this consolidated action,

13  defendants contend that the § 10(b) claim is time-barred.

14       In opposition, plaintiffs argue that the § 10(b) claim is timely.  They claim that

15  regardless of whether inquiry notice or actual notice is the standard, they could not have

16  discovered, and did not discover, defendants' unlawful practices before 2006.  They assert

17  that the first indication of any possible wrongdoing with respect to VeriSign's stock option

18  grants came on June 27, 2006, when VeriSign announced the federal investigation.  They

19  contend that there is no way they could have been put on notice of defendants' wrongful

20  acts before the U.S. Department of Justice or the SEC was aware of it.

21       The court finds that the claim is only partially time-barred.  Plaintiffs have adequately

22  established that they were not placed on notice of the alleged violations prior to the

23  announcement of the grand jury subpoena and SEC investigation.  However, in the event

24  that plaintiffs are able to state a claim under § 10(b), based on alleged misrepresentations

25  in VeriSign's financial statements in the Company's 10-Ks for fiscal years 2000 through

26  2005, the claim alleging misrepresentations in the Form 10-K for fiscal year 2000, which

27  was filed on March 28, 2001, would be time-barred because the Form 10-K was filed more

28  than five years before the present action was filed on July 5, 2006.

United States District Court

For the Northern District of California

1          ii.      § 14(a) claim

2          Plaintiffs allege that proxy solicitations issued from March 31, 1999, to April 16,

3    2003, for the election of VeriSign's directors, contained false or misleading information,

4    including the allegedly false nominal grant dates.  CAC ¶¶ 153-155.  In the eighteenth

5    cause of action, plaintiffs assert that the proxy statements violated § 14(a) and Rule 14a-9

6    because they omitted material facts, including that the individual defendants were

7    knowingly causing VeriSign to engage in an option backdating scheme.  CAC ¶ 269.

8    Plaintiffs request damages and injunctive relief in the form of voiding the elections for which

9    the proxy solicitations were issued.

10         Defendants argue that the § 14(a) claim should be dismissed because plaintiffs

11   cannot obtain relief under that provision.  Section 14(a) prohibits the solicitation of proxy

12   votes "in contravention of such rules and regulations as the [SEC] may prescribe as

13   necessary or appropriate in the public interest or for the protection of investors."  15

14   U.S.C.§ 78n(a).  SEC Rule 14a-9 prohibits solicitations "containing any statement which

15   . . . is false or misleading with respect to any material fact, or which omits to state any

16   material fact necessary in order to make the statements therein not false or misleading."

17   Mills v. Electric Auto-Lite Co., 396 U.S. 375, 383 (1970).

18         To state a claim under Rule 14a-9 and Section 14(a), a plaintiff must allege a false

19   or misleading statement or omission of material fact; that the misstatement or omission was

20   made with the requisite level of culpability; and that it was an essential link in the

21   accomplishment of the transaction.  Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th

22   Cir. 2000); see also In re Atmel, 2007 WL 2070299, at *8.  Under the PSLRA, a § 14(a)

23   claim must be pled with particularity.  The required state of mind for a § 14 claim is

24   negligence, however, not knowledge or deliberate recklessness.  See In re McKesson

25   HBOC, Inc. Sec. Litig., 126 F.Supp. 2d 1248, 1267 (N.D. Cal. 2000).  Thus, plaintiffs must

26   plead particularized facts that give rise to a strong inference of negligence.  Id.

27         Defendants argue that the allegations in the CAC do not support a claim that the

28   proxy solicitations caused any damages, because the request for injunctive relief is moot,

United States District Court
For the Northern District of California

1   and because the claim is time-barred.

2       First, defendants contend that the CAC does not state what damages VeriSign

3   suffered as a result of the allegedly misleading proxy statements.  They argue further that

4   there can be no damages, as the election of particular slates of directors could not have

5   caused any damage to VeriSign.  They note that a plaintiff in a proxy solicitation case must

6   plead and prove a "transactional nexus" or a "transactional causation."  See Gaines v.

7   Haughton, 645 F.2d 761, 776 (9th Cir. 1981), overruled in part on other grounds by In re

8   McLinn, 739 F.2d 1395, 1397 (9th Cir. 1984) (en banc).  Thus, they argue, under § 14(a),

9   plaintiffs can seek only damages that resulted directly from the transaction at issue in the

10  proxy solicitation – here, the election of the directors.

11      Defendants contend that plaintiffs cannot meet the "transactional causation"

12  requirement by requesting damages based on the alleged backdating or on VeriSign's

13  repurchase of its shares following the alleged backdating, because those transactions were

14  not subject to shareholder approval, via the challenged proxy statements or otherwise.

15  Defendants also assert that plaintiffs cannot satisfy the "transactional causation"

16  requirement by alleging that the proxy solicitations damaged VeriSign by causing the

17  election of directors who subsequently took actions harmful to the Company, because the

18  mere fact that omissions in proxy materials, by permitting directors to win election, indirectly

19  lead to financial loss through mismanagement does not create a sufficient nexus with the

20  alleged monetary loss.

21      Second, defendants contend that plaintiffs' request for injunctive relief is moot

22  because all the challenged elections authorized directorial terms that are now expired.  The

23  CAC challenges proxy solicitations filed on five dates – March 31, 1999; April 22, 1999;

24  April 12, 2001; April 3, 2002; and April 16, 2003.  Each of those directorial elections

25  authorized a three-year term for the directors elected, the most recent of which expired in

26  April 2006.  Thus, defendants argue, it is too late to void any of those elections, which fact

27  moots plaintiffs' request for injunctive relief.

28      Third, defendants assert that the § 14(a) claim is untimely, because the last filed

52

United States District Court
For the Northern District of California

1   proxy statement on which plaintiffs base their claims was filed on April 16, 2003, which is

2   more than three years before the date the present action was filed.  Here, the last-filed

3   proxy statement upon which plaintiffs base their claims was filed on April 16, 2003, which is

4   more than three years before the July 5, 2006, filing date for plaintiffs' complaint.

5         The court finds that the motion must be GRANTED because the § 14(a) claim is

6   time-barred.  The limitations period for a § 14(a) claim is "one year after the plaintiff

7   discovers the facts constituting the violation, and in no event more than three years after

8   such violation."  <u>Westinghouse Elec. Corp. by Levit v. Franklin</u>, 993 F.2d 349, 353 (3d Cir.

9   1993). Plaintiffs allege false and misleading statements in proxy statements filed on March

10   31, 1999; April 22, 1999; April 12, 2001; April 3, 2002, and April 16, 2003.  The complaint in

11   the present action was filed on July 5, 2006, which was more than three years after the

12   proxy statements were filed.  Thus, the claim under § 14(a) and Rule 14a-9 is barred by

13   § 14(a)'s three-year statute of repose.

14         In their opposition, plaintiffs argue that where, as here, a § 14(a) claim is brought on

15   the basis of fraud, the statute of limitations in 28 U.S.C. § 1658 supplements the one-year-

16   after-discovery or three-years-after-occurrence statute of limitations that would otherwise

17   apply to a § 14(a) claim.

18         Plaintiffs also assert that under federal law, the five-year statute of limitations (under

19   28 U.S.C. § 1658) begins when the last alleged misrepresentation was made by

20   defendants.  Here, they submit, the last alleged misrepresentation in a proxy statement was

21   made on April 16, 2003.  Thus, plaintiffs argue, the five-year period did not begin to run

22   until after April 16, 2003, at the earliest.

23         A Section 14(a) claim is not a claim that "sounds in fraud" under the Sarbanes-Oxley

24   Act of 2002, so its statute of limitations was not extended by 28 U.S.C. § 1658(b)(2).  Thus,

25   the statute of limitations is one year from the discovery of the occurrences giving rise to the

26   claim, but no later than three years from the date of the violation.  <u>In re Zoran</u>, 2007 WL

27   1650948, at *24; <u>see also</u> <u>In re Exxon Mobile Corp. Sec. Litig.</u>, 387 F.Supp. 2d 407, 423-24

28   (D.N.J. 2005); <u>In re King Pharms., Inc.</u> 2004 WL 5043539, at *7 (E.D. Tenn., Aug. 11,

United States District Court

For the Northern District of California

2004); <u>Virginia M. Damon Trust v. North Country Fin. Corp.</u>, 325 F.Supp. 2d 817, 823-24 (W.D. Mich. 2004); <u>In re Global Crossing, Ltd. Sec. Litig.</u>, 313 F.Supp. 2d 189, 196-97 (S.D.N.Y. 2003).

The court also finds that the § 14(a) claim fails to state a claim for two additional reasons.  First, as argued by defendants, plaintiffs fail to allege any injury suffered as a result of the allegedly misleading proxy statements – that is, they allege no direct injury suffered by VeriSign as a corporation as a direct result of the transaction that was at immediate issue in the proxy (election of directors).  Damages are recoverable under § 14(a) "only when the votes for a specific corporate transaction requiring shareholder authorization . . . are obtained by a false proxy statement, and that transaction was the direct cause of pecuniary injury for which recovery is sought."  <u>Gen'l Elec. Co. by Levit v. Cathcart</u>, 980 F.2d 927, 932 (3rd Cir. 1992).

Second, plaintiffs fail to plead the required state of mind with particularity as to each defendant, as required by the PSLRA.  The required state of mind for a § 14(a) claim is negligence.  Here, plaintiffs plead no particularized facts "giving rise to a strong inference" that each defendant acted with the required state of mind.  <u>See</u> 15 U.S.C. § 78u-4(b)(2).

ii.    § 20(a) claim

Defendants argue that the § 20(a) claim for "controlling person" liability must be dismissed because plaintiffs have not adequately alleged a primary violation.  Plaintiffs argue, however, that they have alleged a primary violation, and that the § 20(a) claim can therefore proceed.

Under § 20(a), joint and several liability can be imposed on persons who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a).  Violation of § 20(a) is predicated on a primary violation under the 1934 Act.  <u>Heliotrope Gen'l, Inc. v. Ford Motor Co.</u>, 189 F.3d 971, 978 (9th Cir. 1999).  A claim that individual defendants are "controlling persons" of a company must allege (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator.  <u>America West</u>, 320 F.3d at 945; see also <u>Howard v. Everex Sys., Inc.</u>, 228 F. 3d 1057, 1065 (9th

United States District Court

For the Northern District of California

Cir. 2000).

Plaintiffs allege the § 20(a) claim against Evan, Kremian, and the director defendants.  They assert that Evan and Kremian – former CFOs of VeriSign – and the director defendants – "by virtue of their positions with VeriSign and their specific acts" – were controlling persons of VeriSign and exercised their power and influence "to cause VeriSign to engage in the illegal conduct and practices complained of" in the CAC.  CAC ¶ 275.

The court finds that the motion must be GRANTED, for two reasons.  First, plaintiffs have not adequately stated a claim of a primary violation, and the § 20(a) claim therefore cannot proceed.  See, e.g., Paracor Fin., Inc. v. Gen'l Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996).

Second, plaintiffs do not allege that Evan, Kremian, or the director defendants controlled a primary violator.  The derivative claims are asserted on behalf of VeriSign.  Plaintiffs do not allege claims against VeriSign as a primary violator, and indeed, it is logically impossible for a corporation on whose behalf a derivative action is brought to also be a primary violator.  Yet, in the § 20(a) claim, plaintiffs assert that the alleged controlling persons exercised their power and influence over VeriSign.  CAC ¶ 275.  Thus, the § 20(a) cause of a action fails to state a claim.

> b.    State Law Claims

Defendants seek an order dismissing the first through thirteenth causes of action, alleging breach of fiduciary duty, accounting, unjust enrichment, rescission, constructive fraud, corporate waste, breach of contract, insider trading under California law, gross mismanagement, and restitution.  Defendants contend that plaintiffs were on notice of the facts underlying all their state law claims more than four years before they sued, and that all those claims are therefore time-barred and should be dismissed on that basis.

Plaintiffs argue, however, that the statute of limitations is subject to the "discovery rule," that it should be equitably tolled, and that it should be tolled based on the doctrine of fraudulent concealment.

**United States District Court**
For the Northern District of California

1              i.      What law applies

2       Before resolving this dispute, the court must determine which law applies to the state

3   law claims.  Plaintiffs in this case invoke federal question jurisdiction under 28 U.S.C. §

4   1331, supplemental jurisdiction under 28 U.S.C. § 1367(a), and diversity jurisdiction under

5   28 U.S.C. § 1332(a)(1).  Defendants assert that federal choice-of-law rules apply because

6   plaintiffs allege federal question jurisdiction.

7       A federal court sitting in diversity applies the substantive law of the state in which it

8   sits, and applies federal procedural rules.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78

9   (1938); see also Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (district

10  court exercising diversity jurisdiction must follow substantive law, including choice-of-law

11  rules, of forum state).  Statutes of limitations are considered substantive for purposes of

12  Erie.  See Guaranty Trust Co. of New York v. York, 326 U.S. 99, 109 (1945).

13      In an action involving state law claims, federal courts also follow Klaxon and apply

14  the law of the forum state, even where the plaintiff also asserts claims under federal law.

15  MRO Commc'ns, Inc. v. American Tel & Tel. Co., 197 F.3d 1276, 1282 (9th Cir. 1999); see

16  also Bass v. First Pac. Networks, Inc., 219 F.3d 1052, 1055 n.2 (9th Cir. 2000) (federal

17  court exercising supplemental jurisdiction over state law claims is bound to apply law of

18  forum state to same extent as if it were exercising its diversity jurisdiction).

19      Under the "internal affairs" doctrine, the law of the state of incorporation governs

20  liabilities of officers or directors to the corporation and its shareholders.  Shaffer v. Heitner,

21  433 U.S. 186, 215 n.44 (1977); see also CTS Corp. v. Dynamics Corp. of America, 481

22  U.S. 69, 89 (1987); First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462

23  U.S. 611, 621 (1983); Rest. (Second) of Conflict of Laws § 309 and comment (a).  Internal

24  corporate affairs involve those matters that are peculiar to the relationships among or

25  between the corporation and its current officers, directors, and shareholders.  Edgar v.

26  MITE Corp., 457 U.S. 624, 645 (1982); see Rest. (Second) of Conflict of Laws § 313,

27  comment (a).  Under this doctrine, courts look to a corporation's state of incorporation as

28  the source of substantive law governing claims regarding that corporation's internal affairs.

United States District Court

For the Northern District of California

1  Kamen, 500 U.S. at 108-09.

2      In general, courts in California follow the internal affairs doctrine.  See Cal. Corp.

3  Code § 2116 (directors of foreign corporation transacting intrastate business are liable to

4  corporation for making of unauthorized dividends, purchase of shares or distribution of

5  assets of false certificates, reports or public notices or other violation of official duty

6  according to applicable laws of state of incorporation);[20] see also Batchelder v. Kawamoto,

7  147 F.3d 915, 920 (9th Cir. 1998); Davis & Cox v. Summa Corp., 751 F.2d 1507, 1527 (9th

8  Cir. 1985).  Thus, Delaware law, the law of the state of VeriSign's incorporation, applies to

9  all causes of action that implicate the Company's internal affairs, including the claims for

10  breach of fiduciary duty, accounting, unjust enrichment, rescission, constructive fraud,

11  corporate waste, breach of contract, gross mismanagement, and restitution.

12      Delaware applies a three-year statute of limitations to claims of tort, contract, and

13  breach of fiduciary duty.  10 Del. Ch. § 8106.  The three-year limitation period is also

14  applied to equitable claims by analogy.  See Smith v. McGee, 2006 WL 3000363, at *3

15  (Del. Ch., Oct. 16, 2006); see also Ryan, 918 A.2d at 359.  "The statute of limitations

16  begins to run at the time that the cause of action accrues, which is generally when there

17  has been a harmful act by a defendant.  This is true even if the plaintiff is unaware of the

18  cause of action or the harm."  In re Tyson Foods, Inc. Consol. Shareholder Litig., 919 A.2d

19  563, 584 (Del. Ch. 2007).

20                    ii.      Whether the first through thirteenth causes of action are time-

21                             barred

22      Under Delaware law, a plaintiff may toll the limitations period by specifically alleging

23  that the facts were "so hidden that a reasonable plaintiff could not have made timely

24  discovery of an injury necessary to file a complaint."  Smith, 2006 WL 3000363, at *3; see

25  also In re Tyson, 919 A.2d at 584-85.  If the plaintiff sufficiently meets his burden of

26  _____

27      [20]  California makes an exception to the internal affairs doctrine where shares of the
   foreign corporation are not listed or traded on a national exchange, and where more than
28  one-half of the outstanding voting shares are held by California residents.  Cal. Corp. Code §
   2115.

57

United States District Court
For the Northern District of California

showing that the statute was tolled, relief extends only until plaintiff is on inquiry notice. Ryan, 918 A.2d at 359. Tolling ends when plaintiff discovers, or in the exercise of reasonable diligence should have discovered, his injury. Id.[21]

The statute of limitations may also be tolled when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth. In re Tyson, 919 A.2d at 585. Under this doctrine, a plaintiff is required to allege an act of "actual artifice" by the defendant that either "prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth." Id.

Finally, where a plaintiff has reasonably relied on the competence and good faith of a fiduciary, the doctrine of equitable tolling stops the statute from running. Id. No evidence of actual concealment is necessary in such a case, but the statute is tolled only until the investor "knew or had reason to know of the facts constituting the wrong." Id. (citation omitted).

Under any of these theories, a plaintiff bears the burden of showing that the statute was tolled, and relief from the statute extends only until the plaintiff is put on inquiry notice. "Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled." Id.

Plaintiffs argue that the statute of limitations should be tolled because the first public indication of any potential improprieties concerning the granting of stock options at VeriSign came on June 27, 2006, when the Company announced that it had received a grand jury

_____

[21] A similar rule applies in California. Under California law, a limitations period begins to run when a cause of action accrues, which is normally "at the time when the cause of action is complete with all its elements." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 806 (2005). A plaintiff whose claim is time-barred on its face has the burden of showing that he or she should be able to invoke the "discovery rule." Id. at 808. Under this rule, a cause of action does not accrue "until the plaintiff discovers, or has reason to discover, the cause of action." Id. at 807. A plaintiff has reason to discover a cause of action when he or she has reason to suspect a factual basis for wrongdoing that has caused him or her harm. Id. The discovery rule "only delays accrual until a plaintiff has, or should have, inquiry notice of the cause of action." Id. To invoke the discovery rule, the plaintiff must specifically plead facts showing the time and manner of discovery, and the inability to have made earlier discovery despite reasonable diligence. Id. at 808.

United States District Court

For the Northern District of California

1  subpoena and a request from the SEC for documents relating to its stock option grants and

2  practices.

3      Plaintiffs also assert that the allegations in the CAC satisfy the requirements of the

4  doctrine of fraudulent concealment, because defendants are alleged to have caused

5  VeriSign to falsely represent that the exercise price of the stock option grants was the fair

6  market value of VeriSign's stock, measured by the publicly traded price as of the date of

7  the grant.  They argue further that defendants' roles as fiduciaries justify tolling the statute

8  of limitations through the doctrine of equitable tolling because plaintiffs were entitled to rely

9  on the competence and good faith of those protecting their interests.

10     In response, defendants contend that plaintiffs cannot claim that they were not on

11 notice of the backdated option grants until VeriSign's June 27, 2006, announcement, and

12 then also base their allegations of options backdating entirely on the alleged "striking"

13 pattern of option grants and VeriSign stock prices.  Defendants claim that numerous

14 academics, journalists, stock analysts, and federal prosecutors had reason to analyze and

15 inquire regarding stock option practices long before June 27, 2006, based on the same sort

16 of "striking" pattern that plaintiffs allege.  Defendants also assert that plaintiffs fail to allege

17 any facts beyond the "striking" pattern referenced in the CAC that were not publicly

18 available before they filed the first complaint in this case in July 2006.

19     Defendants contend that the issue for the court on this motion to dismiss is whether

20 the "striking" pattern of stock option grants and stock price movements serve to put

21 plaintiffs on inquiry notice of the potential claims they attempt to plead against the individual

22 defendants.  Defendants assert that if this question is answered in the affirmative, then

23 "fraudulent concealment" does not apply because plaintiffs were already on notice that the

24 option grants were fraudulent, and plaintiffs' claims are time-barred.

25     The court finds that the claims are not time-barred.  As with the federal claims,

26 plaintiffs have adequately established that they were not placed on inquiry notice of the

27 alleged violations prior to the announcement of the grand jury subpoena and the SEC

28 investigation.

**United States District Court**

For the Northern District of California

1          ii.      Whether the third, fourth, fifth and seventh, eighth, ninth,

2                   eleventh, and twelfth causes of action state a claim

3          Defendants contend that the claims of unjust enrichment, rescission, constructive

4    fraud, breach of contract, insider trading under California law, and restitution fail to state a

5    claim.

6                                    *Unjust enrichment*

7          Defendants assert that the third cause of action for unjust enrichment should be

8    dismissed because a contract already governs the parties' relationship, and because the

9    claim is untimely.  They note that the CAC specifically pleads in the eighth cause of action

10   that the option defendants' employment contracts govern their compensation, and that the

11   option defendants have breached those contracts.  Thus, defendants argue, the claim for

12   unjust enrichment should be dismissed.

13         In opposition, plaintiffs argue that the unjust enrichment claim is not precluded by the

14   existence of a contract.  They submit that as officers and directors of the Company,

15   defendants had fiduciary duties independent from their contractual obligations.  Thus,

16   plaintiffs assert, the unjust enrichment claim survives independent of any contractual claim

17   or obligation.  They also contend that because the CAC alleges that the option defendants'

18   contracts are subject to rescission based on allegations of fraud, the unjust enrichment

19   claim is not precluded because of the existence of any contract.

20         Under Delaware law, a claim for unjust enrichment has five elements – (1) an

21   enrichment, (2) an impoverishment, (3) a relation between the enrichment and the

22   impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided

23   by law.  See Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del. Ch. 1999).

24   "[N]o action for unjust enrichment lies where a contract governs the parties' relationship to

25   each other."  McKesson HBOC, Inc. v. N.Y. State Common Retirement Fund, Inc., 339

26   F.3d 1087, 1091 (9th Cir. 2003) (applying Delaware law).

27         The court finds that the motion must be DENIED.  To the extent that plaintiffs are

28   ultimately able to prevail under a breach of contract theory, they will be precluded from also

                                          60

United States District Court
For the Northern District of California

1    recovering under a claim of unjust enrichment.  However, for pleading purposes, plaintiffs

2    are entitled to assert claims in the alternative and to plead inconsistent causes of action.

3    See Fed. R. Civ. Pro. 8(e)(2); Oki America, Inc. v. Microtech Int'l, Inc., 872 F.2d 312, 314

4    (9th Cir. 1989); In re Wal-Mart Wage and Hour Employment Practices Litig., 490 F.Supp.

5    2d 1091, 1117 (D. Nev. 2007).

6       McKesson, on which defendants rely, is distinguishable.  In that case, plaintiff

7    McKesson sued its own shareholders for unjust enrichment arising from a merger between

8    McKesson and HBO & Company ("HBOC").  McKesson alleged that the former HBOC

9    shareholders were the beneficiaries of a windfall triggered by alleged accounting

10    improprieties by HBOC.  The court first noted that no action for unjust enrichment lies

11    where a contract governs the parties' relationship, but also found that in the case before it,

12    an unjust enrichment claim was theoretically possible, as there was no controlling contract

13    between the parties.  The court held, however, that the plaintiff could not maintain an action

14    for unjust enrichment (an equitable claim), in part because of the availability of potential

15    legal claims against "targets for recovery" other than the former HBOC shareholders,

16    McKesson, 339 F.3d at 1093, and in part because a restitutionary award would have been

17    unjust under the circumstances presented by the case, id. at 1095-96.

18       While McKesson accurately states the rule that no action for unjust enrichment is

19    possible where a contract governs the parties' relationship, that rule did not control the

20    outcome of the case, as there was no contract between the parties.  Thus McKesson does

21    not support defendants' position here, which appears to be that a plaintiff cannot plead

22    breach of contract and also plead unjust enrichment in the alternative.

23                      *Rescission and constructive fraud*

24       Defendants contend that the fourth cause of action for rescission and the fifth cause

25    of action for constructive fraud fail to state a claim.  Plaintiffs seek rescission of the option

26    grants on the grounds that they were procured by "fraud, deceit and abuse of control."

27    CAC ¶ 208.  In order to obtain rescission on those grounds, plaintiffs must show either

28    actual or constructive fraud.  Both actual and constructive fraud require reliance on an

United States District Court

For the Northern District of California

1   alleged misrepresentation by the defrauded party.  Wal-Mart Stores, Inc. v. AIG Life Ins.

2   Co., 901 A.2d 106, 115 (Del. 2006).

3         Here, defendants contend that plaintiffs cannot show reliance.  The individuals who

4   are alleged to have awarded the grants to the option defendants were the members of the

5   Compensation Committee, but plaintiffs repeatedly assert in the CAC that the members of

6   that committee were complicit in the purported backdating scheme.  Thus, defendants

7   argue, plaintiffs cannot show that the individuals awarding the grants could have relied on

8   any misrepresentation made by the option defendants.  In addition, defendants contend

9   that plaintiffs have not pled with any particularity the misrepresentations used to

10  fraudulently procure the option grants, as required by Rule 9(b).  Defendants contend that

11  in light of these two deficiencies, the fourth cause of action fails to state a claim for

12  rescission.

13        In opposition, plaintiffs argue that rescission is appropriate based on defendants'

14  misconduct, as well as their abuse of control, and the illegal nature of the grants which

15  made the granting of backdated stock options invalid, ultra vires acts, since such grants

16  were not authorized or made in accordance with the terms of the Company's shareholder-

17  approved stock option plans.  Thus, plaintiffs assert, the claim for rescission is properly

18  pled even without an allegation of a fraudulent basis for the claim.

19        Plaintiffs also contend that a claim for constructive fraud is not really a claim of fraud,

20  and therefore is not required to be pled under Rule 9(b).  Nevertheless, they also submit

21  that a fair reading of the CAC shows that the claim for constructive fraud meets the

22  requirements of Rule 9(b), which requires only that the circumstances constituting the fraud

23  be stated with particularity, but allows state of mind to be "averred generally."

24        Plaintiffs point to the allegations that the Company, with the knowledge, approval,

25  and participation of each of the individual defendants, disseminated false financial

26  statements in Form 10-K filings.  Plaintiffs also assert that the CAC lists specific

27  fraudulently filed proxy statements, and specific false statements contained within and

28  omitted from the proxies; and that the CAC alleges that the option defendants fraudulently

62

United States District Court

For the Northern District of California

1   caused the Company, through its Board of Directors, to issue backdated stock option

2   grants that were in direct violation of shareholder-approved stock option plans.  Plaintiffs

3   argue that as such, the CAC states a claim for rescission.

4       In reply, defendants reiterate that the rescission claim fails because plaintiffs have

5   not adequately alleged the elements of either actual or constructive fraud.  In response to

6   plaintiffs' assertion that they do not need to plead actual or constructive fraud in order to

7   state a claim for rescission, but may simply rely on allegations that the option grants were

8   "invalid," defendants argue that plaintiffs never explain how the stock options were "invalid"

9   in any way beyond their initial allegations.

10      The court finds that the motion must be GRANTED.  Plaintiffs' cause of action for

11  rescission amounts to a claim for relief based on constructive fraud.  Constructive fraud

12  "arises on a breach of duty by one in a confidential or fiduciary relationship to another that

13  induces justifiable reliance by the other to his or her prejudice."  37 Am. Jur. Fraud and

14  Deceit § 8 (2001), quoted in Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d

15  1211,1236 n.70 (Del. Ch. 2001), judgment reversed on other grounds, 817 A.2d 149 (Del.

16  Supr. 2002).

17
18          Fraud is either actual or constructive.  Constructive fraud is a breach of legal
            or equitable duty which, irrespective of moral guilt, the law declares fraudulent
            because of its tendency to deceive others, to violate public or private
19          confidence, or to injure public interests.  It is a term applied to a great variety
            of transactions which equity regards as wrongful, to which it attributes the
20          same or similar effects which follow from actual fraud, and for which it gives
            the same relief as that granted in cases of actual fraud.  While called
21          constructive fraud, it is nevertheless fraud.

22  Schmeusser v. Schmeusser, 559 A.2d 1294, 1297 (Del. 1989) (citation and quotation

23  omitted); see also Wal-Mart Stores, 901 A.2d at 114-16.

24      In federal court, claims of fraud must be pled with particularity.  Fed. R. Civ. P. 9(b).

25  Here, plaintiffs have not alleged constructive fraud with particularity, in part, because they

26  have not alleged the elements as to each specific defendant, but only generally, and have

27  not pled reliance.  Indeed, it is not clear that plaintiffs' claim of constructive fraud is

28  distinguishable in any way from their claim of breach of fiduciary duty.  In the first cause of

United States District Court
For the Northern District of California

1   action for breach of fiduciary duty, plaintiffs allege that the individual defendants breached

2   their fiduciary duty by engaging in a scheme to grant backdated stock options to

3   themselves and/or other officers and directors of the Company, and to cover up their

4   misconduct.  In the fifth cause of action for constructive fraud, plaintiffs allege that the

5   individual defendants owed a duty of candor and full disclosure regarding the true state of

6   VeriSign's business and assets, and that they made misrepresentations and failed to

7   disclose the true facts regarding their stewardship of VeriSign.

8        In addition, plaintiffs have not alleged facts supporting the claim that the options

9   were backdated.  In particular, they have not clearly explained exactly who approved the

10  options and when they were approved; have not stated whether and to what extent the

11  members of the Compensation Committee (as opposed to the whole Board) had the

12  authority to grant options; have not indicated whether other options were granted during the

13  period between 1998 and 2002 that were not backdated; and have not alleged the actual

14  grant dates of the allegedly backdated options or the appropriate price of the options.

15                          *Breach of contract*

16       Defendants contend that the seventh cause of action for breach of contract fails to

17  state a claim.  In this claim, plaintiffs allege that the option defendants breached their

18  employment contracts by entering into the purported backdating scheme.  Defendants

19  contend that this cause of action does not state a claim because plaintiffs do not specify

20  any terms of those employment contracts, or specify the terms that were allegedly

21  breached, and do not state whether the agreements were written or oral.  Defendants

22  argue that a breach of contract claim must plead the terms of the alleged contract.

23       In opposition, plaintiffs assert that the CAC adequately pleads a claim for breach of

24  contract, because it specifies the terms of the Company's stock option plans and "related

25  agreements" and the breaches thereto.  For example, plaintiffs note, the CAC states that

26  during the relevant period, the Company had three stock option plans, and that each

27  provided that the exercise prices of options could not be less than 100% of fair market

28  value on the date of the grant (defined as the stock's closing price on that date); and that

United States District Court

For the Northern District of California

1   the CAC alleges that improper backdating violated the terms of the plans.  Plaintiffs assert

2   that given the specific language about the stock option plans in the CAC, which they claim

3   are the "contracts" at issue in this cause of action, and the specificity with which the CAC

4   asserts that those contracts were violated, the cause of action for breach of contract states

5   a claim.

6        The court finds that the motion must be GRANTED.  The elements of a claim of

7   breach of contract include 1) the existence of a contract, 2) the breach of an obligation

8   imposed by the contract, and 3) resulting damages to the plaintiff.  VLIW Tech., LLC v.

9   Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).  In this case, plaintiffs fail to allege

10  the essential elements of the individual defendants' employment contracts with VeriSign, or

11  how those contracts were breached.  As for plaintiffs' argument that the contracts at issue

12  were the option contracts, there is no indication in the CAC that the individual defendants

13  are parties to the stock option plans.  Moreover, while the plans may be relevant, plaintiffs

14  do not allege that the plans form the basis of the employment relationship between

15  VeriSign and any of the individual defendants.

16                    *Insider trading claims under California law*

17       Defendants argue that the eighth and ninth causes of action for violation of California

18  Corporations Code §§ 25402 and 25403 should be dismissed because those laws do not

19  apply to VeriSign and because the claims are untimely.

20       In the eighth cause of action, plaintiffs allege that the insider selling defendants sold

21  shares of VeriSign stock at the same time that they had access to "highly material

22  information regarding the Company, including the information set forth [in the CAC]

23  regarding the true adverse facts of VeriSign's option backdating, improper accounting, and

24  false financial statements,"  which was not generally available to the public and the

25  securities markets, and that the sales of stock were therefore made in violation of

26  Corporations Code § 25402.  CAC ¶¶ 222-224.

27       In the ninth cause of action, plaintiffs allege that the director defendants (five of

28  whom were also insider selling defendants) were aware of the insider selling defendants'

**United States District Court**
For the Northern District of California

1  knowledge of the material, adverse, non-public information," and that the director

2  defendants, "through their positions, possessed control and influence over the [i]nsider

3  [d]efendants' sale of VeriSign common stock."  CAC ¶¶ 227-228.

4      Defendants contend that because the §§ 25402 and 25403 claims deal with "matters

5  peculiar to the relationships among or between the corporation and its current officers,

6  directors, and shareholders," they fall within the ambit of the internal affairs doctrine.  See

7  Edgar, 457 U.S. at 465.  Defendants assert that because VeriSign is a Delaware

8  corporation, Delaware law governs plaintiffs' claims, making §§ 25402 and  25403

9  inapplicable to this case.   Thus, they argue, the eighth and ninth causes of action fail to

10  state a claim.

11      In opposition, plaintiffs note that the California Court of Appeal has upheld the

12  application of California Corporations Code § 25402 to officers and directors of a Delaware

13  corporation.  In Friese v. Superior Court, 134 Cal. App. 4th 693, 701-03 (2005), cert.

14  denied, Moore v. Friese, 127 S.Ct. 138 (2006), the court discussed the scope of California's

15  security regulation and held that California's securities laws apply to foreign corporations.

16  Friese specifically rejected the argument that the internal affairs doctrine acts to limit §

17  25403 of the California Corporations Code to domestic companies.  Id. at 708-10.

18      Defendants argue, however, that this court need not follow the decision of a

19  California state court on this matter, as this case is in federal court based on plaintiffs'

20  invocation of federal question jurisdiction.  Thus, defendants assert, the federal internal

21  affairs doctrine dictates that any claims relating to the internal affairs of VeriSign are subject

22  to Delaware law, not California law.

23      As explained above, federal choice of law rules do not apply in this case, as plaintiffs

24  invoke diversity jurisdiction, in addition to supplemental jurisdiction over the state law

25  claims.  Based on the ruling by the California Court of Appeal in Friese, the court finds that

26  the claims brought under §§ 25402 and 25403 are not barred by application of California's

27  internal affairs doctrine.  The court does find, however, that the § 25402 claim is partially

28  time-barred, and that it also fails to allege fraud with particularity.  Because the

United States District Court

For the Northern District of California

1   § 25402 claim fails, the § 25403 claim also fails.

2       A § 25402 claim must be brought "before the expiration of five years after the act or

3   transaction constituting the violation or the expiration of two years after the discovery by the

4   plaintiff of the facts constituting the violation, whichever shall first expire."  Cal. Corp. Code

5   § 25506(b).  The five-year bar is a strict limit that may not be tolled.  See In re Atmel, 2007

6   WL 2070299, at *11 (citing SEC v. Seaboard Corp., 677 F.2d 1301, 1308 (9th Cir. 1982).

7   The complaint in this action was filed on July 5, 2006.  Thus, the claim is time-barred to the

8   extent that it alleges sales prior to July 5, 2001.

9       Accordingly, the § 25402 claim asserted against Yanowitch, Schaeffer, Bidzos, and

10  Roper – which alleges insider sales occurring only prior to July 5, 2001, but none after that

11  date – is dismissed as untimely.  The § 25402 claim asserted against Sclavos, Gallivan,

12  Evan, Korzeniewski, Pereira, Chenevich, Cowan, Roper, and Tomlinson is dismissed to the

13  extent that it alleges sales prior to July 5, 2001.

14      In addition, any amended complaint should plead the § 25402 claim with

15  particularity, as insider trading under California law is a fraudulent practice.  Bowden v.

16  Robinson, 67 Cal. App. 3d 705, 711 (1977).  The CAC alleges only that the insider selling

17  defendants "had access to highly material information" regarding VeriSign, including

18  information regarding the "true adverse facts" of the options backdating, the improper

19  accounting, and the false financial statements, and that they sold stock while in possession

20  of that information.  However, plaintiffs do not explain which "true adverse facts" each of the

21  selling defendants knew, when each knew those facts, how they acquired the knowledge,

22  or which sales were made when defendants were in possession of which inside

23  information.

24                          *Claims for restitution*

25      Defendants contend that the eleventh and twelfth causes of action for restitution

26  should be dismissed because they are derivative of the unjust enrichment claim.

27  Restitution is a remedy for unjust enrichment.  Thus, a claim for restitution is derivative of

28  an unjust enrichment claim.  See Schock v. Nash, 732 A.2d 217, 232 (Del. 1999).

United States District Court

For the Northern District of California

1    Defendants contend that the eleventh and twelfth claims for restitution therefore fail for the

2    same reason as the unjust enrichment claim.

3         In opposition, plaintiffs argue that they are entitled to plead in the alternative, and

4    claim that both the unjust enrichment claim and the restitution claims are properly pled.

5    They also assert that their claims for restitution are not premised solely on their unjust

6    enrichment claims, which are limited to the receipt of backdated options. They assert that

7    they also claim restitution against Sclavos, Kremian, and Evan, based on improper

8    bonuses and other equity-based compensation those defendants received partly because

9    of VeriSign's inflated earnings statements.  Plaintiffs contend that defendants have failed to

10   address that claim for restitution.

11        The court finds that the motion must be GRANTED.  While it is true that plaintiffs are

12   entitled to plead in the alternative, Fed. R. Civ. P. 8(e)(2), the claim for restitution as pled

13   seeks an equitable remedy for the equitable claim of unjust enrichment.  Plaintiffs'

14   arguments notwithstanding, the CAC does not allege restitution based on the receipt of

15   improper bonuses and other compensation received by Sclavos, Kremian, and Evan, but

16   simply alleges that the option defendants received benefits by virtue of the exercise of

17   backdated options.

18   B.    KPMG's Motion to Compel Arbitration

19        1.    Legal Standard

20        The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate

21   disputes arising out of transactions involving interstate commerce "shall be valid,

22   irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

23   revocation of any contract."  9 U.S.C. § 2.  The FAA "creates a body of federal substantive

24   law of arbitrability, enforceable in both state and federal courts and pre-empting any state

25   laws or policies to the contrary."  Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,

26   460 U.S. 1, 24 (1983).

27        Any party bound to an arbitration agreement that falls within the scope of the FAA

28   may bring a motion in federal district court to compel arbitration and stay the proceeding

pending resolution of the arbitration.  9 U.S.C. §§ 3, 4.  The FAA eliminates district court

discretion and requires the court to compel arbitration of issues covered by the arbitration

agreement.  Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985).

The role of the federal courts in these circumstances is limited to determining

whether the arbitration clause at issue is valid and enforceable under § 2 of the FAA.

Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000).  However,

despite the "liberal federal policy favoring arbitration agreements," Green Tree Fin. Corp.-

Alabama v. Randolph, 531 U.S. 79, 81 (2000), state law is not entirely displaced from

federal arbitration analysis.  Under § 2, "state law, whether of legislative or judicial origin, is

applicable if that law arose to govern issues concerning the validity, revocability, and

enforceability of contracts generally."  Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987).

Thus, generally applicable contract defenses, such as fraud, duress, or

unconscionability may be applied to invalidate arbitration agreements without contravening

§ 2.  Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 686 (1996).  In making this

determination, federal courts may not address the validity or enforceability of the contract

as a whole.  Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 401 (1967); see

also Ticknor v. Choice Hotels Int'l, Inc., 265 F.3d 931, 936-37 (9th Cir. 2001).

2.    KPMG's Motion

KPMG audited VeriSign's financial statements for the company's fiscal years 1998

through 2005.  Plaintiffs allege that KPMG failed to perform its services with due care, and

they assert derivative claims against KPMG for negligence and professional malpractice,

breach of contract, and aiding and abetting breach of fiduciary duty.

A separate "engagement letter" governed the provision of services by KPMG for

each of VeriSign's fiscal years.  The engagement letter that was executed in March 2005

("the agreement") provides that "[a]ny dispute or claim arising out of or relating to the

engagement letter between the parties, the services provided thereunder, or any other

services provided by or on behalf of KPMG" must be submitted to mediation and, if not

resolved within a period of time or if one party requests, must be submitted to arbitration.

United States District Court

For the Northern District of California

1    The agreement also provides that any issue concerning the extent to which a dispute is

2    subject to arbitration, or "any dispute governing the applicability, interpretation, or

3    enforceability of these [ADR] procedures, including any contention that all or part of these

4    procedures are invalid or unenforceable," shall be governed by the Federal Arbitration Act

5    and resolved by the arbitrators.

6         KPMG asserts that under this agreement, the FAA governs the dispute, and the

7    claims asserted against KPMG by plaintiffs in this action – the thirteenth, fourteenth,

8    fifteenth, and sixteenth causes of action – must be referred to arbitration.  KPMG argues

9    that the claims asserted against it should be dismissed or stayed pending arbitration.

10        KPMG contends further that the FAA would apply even without the explicit provision

11   in the agreement because VeriSign's stock trades on a national exchange, and KPMG was

12   engaged to audit financial statements that VeriSign was required to file in order to maintain

13   its listing on that exchange.  Since the FAA applies in connection with all contracts

14   "affecting commerce," 9 U.S.C. § 2, KPMG contends that this case requires application of

15   the FAA.

16        KPMG also argues that the agreement between VeriSign and KPMG binds the

17   derivative plaintiffs and covers all their claims against KPMG.  KPMG asserts that the

18   derivative plaintiffs have no greater rights than VeriSign itself has, and that because the

19   derivative plaintiffs are pursuing VeriSign's claims, they are bound by VeriSign's agreement

20   to mediate or arbitrate those claims.  KPMG contends that because the agreement covers

21   all claims arising out of services KPMG performed before, during, and after the agreement,

22   it covers the derivative plaintiffs' claims.

23        In opposition, plaintiffs assert that because plaintiffs' claims against KMPG are

24   based on events that pre-dated the March 2005 agreement, the arbitration provision in that

25   agreement does not apply.  They contend that because the 2005 agreement was the first

26   one that contained an arbitration provision, no agreement to arbitrate existed from 1998 to

27   2005.  They assert that arbitration cannot be compelled for disputes that arose during

28   periods when no effective contract requiring arbitration was in place.

United States District Court
For the Northern District of California

1    Plaintiffs also note that the language in the March 2005 agreement is in the present

2    tense, and argue that the March 2005 agreement does not subsume previous agreements

3    or otherwise extend by its terms to prior services KPMG provided to VeriSign, and that the

4    agreement does not contain any provisions indicating that it governs or amends prior

5    agreements.

6    Plaintiffs contend that the Company was required to enter into a new engagement

7    letter with an auditor to perform VeriSign's audit for the coming year, and that the

8    shareholders had to approve the engagement of that auditor.  They argue that once the

9    shareholders approved engagement letters that did not contain arbitration provisions, it

10   would be inconsistent with this process (requiring shareholder approval of auditor) to allow

11   KPMG to change the terms of the agreement to require arbitration.

12   Plaintiffs assert that there is no statement in the March 2005 agreement indicating

13   that the new engagement letter's arbitration provision covered past services provided by

14   KMPG to VeriSign, and that because arbitration provisions cannot be considered

15   retroactive unless the agreement contains an express provision to that effect, the March

16   2005 agreement between VeriSign and KMPG cannot be held to operate retroactively.

17   The court finds that the motion must be GRANTED.  The FAA governs the issue of

18   arbitrability here because the agreement expressly so provides and because the

19   agreement involves interstate commerce.  The agreement covers all the derivative

20   plaintiffs' claims because it encompasses any dispute arising out of the agreement,

21   KPMG's services thereunder, and "any other services provided by or on behalf of KPMG."

22   The court is not persuaded by plaintiffs' argument that the arbitration provision does

23   not apply to their claims because all the events underlying the claims occurred before the

24   parties executed the agreement.  The arbitration provision is extremely broad, and covers

25   not just services provided under the agreement, but also "any other services provided by

26   KPMG," and disputes and claims involving "any entity for whose benefit the services in

27   question are or were provided."

28   The cases cited by plaintiffs are inapposite, as they involve agreements providing for

United States District Court

For the Northern District of California

1   arbitration only of claims arising under the agreements themselves.  See, e.g., Wachovia

2   Bank, N.A. v. Schmidt, 445 F.3d 762, 767 (4th Cir. 2006); Security Watch, Inc. v. Sentinel

3   Sys., Inc., 176 F.3d 369, 372 (6th Cir. 1999).  Here, however, the arbitration agreement is

4   not limited to claims arising under the agreement itself.  In addition, as KPMG points out,

5   some courts have allowed arbitration agreements to apply retroactively to transactions that

6   occurred prior to the execution of the agreement.  See In re Universal Service Fund Tel.

7   Billing Practices Litig., 300 F.Supp. 2d 1107, 1124 (D. Kan. 2003); Merrill Lynch, Pierce,

8   Fenner & Smith, Inc. v. King, 804 F.Supp. 1512, 1514 (M.D. Fla. 1992).

9       Doubts or ambiguities must be resolved in favor of and not against arbitration.

10  Moses H. Cone Mem'l Hosp v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983).  Moreover,

11  under the terms of the agreement, any doubts about arbitrability must be resolved by the

12  arbitrators.  Thus, at a minimum, the arbitrators, not the court, must decide the question of

13  arbitrability.

14                                **CONCLUSION**

15      In accordance with the foregoing, VeriSign's motion to dismiss the complaint for

16  failure to allege demand futility is GRANTED, and KMPG's motion to compel arbitration is

17  GRANTED.  In addition, the individual defendants' motion to dismiss the first through

18  twelfth and the seventeenth through nineteenth causes of action for failure to state a claim

19  is GRANTED in part and DENIED in part.

20      The complaint is dismissed with leave to amend, although the court is doubtful that

21  plaintiffs will be able, in any amended complaint, to plead sufficient particularized facts to

22  establish demand futility.  As for the individual claims, the eighteenth cause of action is

23  dismissed with prejudice, and the fourth, fifth, seventh, eighth, ninth, eleventh, seventeenth,

24  and nineteenth causes of action are dismissed with leave to amend.

25      In addition, while the court is cognizant both of Rule 8(a)(2)'s threshold requirement

26  that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to

27  relief," Bell Atlantic, 127 S.Ct. at 1959 (2007) (citation omitted), and of the pleading

28  requirements of Rule 23.1 and the PSLRA, the court finds the 117-page CAC to be, in the

                                    72

**United States District Court**
For the Northern District of California

1    words of the Delaware Supreme Court, a truly "prolix complaint larded with conclusory

2    language," <u>Brehm</u>, 746 A.2d at 254.

3         The court suggests that plaintiffs avoid reproducing either the mass or the

4    generalized, boilerplate allegations of the CAC in any amended complaint; and that the

5    sixth cause of action for corporate waste be eliminated as duplicative of the second cause

6    of action for unjust enrichment; that the fifth cause of action for constructive fraud be

7    eliminated as duplicative of the first cause of action for breach of fiduciary duty if plaintiffs

8    are unable to plead constructive fraud with particularity; and that the accounting, rescission,

9    and restitution claims be included as remedies, not as separate causes of action.

10        Any amended complaint shall be filed no later than October 17, 2007.

11

12   **IT IS SO ORDERED.**

13   Dated:  September 14, 2007                    _____

14                                                PHYLLIS J. HAMILTON
                                                  United States District Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28